UNITED STATES, Appellee,

v.

Rickie D. SMITH, First Lieutenant,
U.S. Army, Appellant.

No. 50,306.
CM 443298.

U.S. Court of Military Appeals.

Nov. 7, 1988.

For Appellant: *Captain Joseph Tauber* (argued); *Colonel Brooks B. LaGrua, Lieutenant Colonel Paul J. Luedtke, Major Eric T. Franzen, Captain Craig E. Teller* (on brief); *Lieutenant Colonel William P. Heaston, Captain Harry L. Williams, Jr., Captain Michael D. Graham, Captain David W. Sorensen.*

For Appellee: *Captain Patrick A. Hewitt* (argued); *Colonel James Kucera, Lieutenant Colonel Adrian J. Gravelle, Lieutenant Colonel Gary F. Roberson, Captain Patrick J. Cunningham* (on brief);

*Lieutenant Colonel Thomas M. Curtis* and *Captain Samuel J. Rob.*

### Opinion of the Court

EVERETT, Chief Judge:

Lieutenant Smith was tried at Fort Ord, California, by a general court-martial composed of members. Contrary to his pleas, he was found guilty of conduct unbecoming an officer and a gentleman by indecently assaulting Lieutenant Laurie J. Engiles, in violation of Article 133 of the Uniform Code of Military Justice, 10 U.S.C. § 933. The sentence was dismissal, confinement for 2 years, and total forfeitures. Although he approved the findings and sentence, the convening authority suspended confinement in excess of 3 months until completion of appellate review with a provision for automatic remission.

In light of information which came to the attention of the defense some weeks after trial, appellant filed in the Court of Military Review a motion for a *DuBay*[1] hearing; but this motion was denied. Unpub. op. (Aug. 2, 1983). Subsequently, that court affirmed the findings and sentence, 18 M.J. 704 (1984), after which this Court granted review of these issues:

### I

WHETHER THE COURT LACKED JURISDICTION TO TRY APPELLANT BECAUSE THE CONVENING AUTHORITY UTILIZED GENDER AS A SELECTION CRITERION AND THUS DID NOT PROPERLY SELECT THE MEMBERS AS REQUIRED BY ARTICLE 25(D)(2), UCMJ.

### II

WHETHER THE PROSECUTORIAL HANDLING OF THE SELECTION OF COURT MEMBERS GRANTED THEM AN UNFAIR ADVANTAGE IN THE SEATING OF COURT MEMBERS AND CREATED AN IMPROPER APPEARANCE OF EVIL IN THE ADMINISTRATION OF CRIMINAL JUSTICE.

### I

### A

During March 1982, appellant, Lieutenant Engiles, and their company went to Fort Irwin, California, to support the Gallant Eagle Exercise. The entire platoon was bivouacked in two large tents, one of which Engiles shared with appellant and several enlisted men. One end of the tent had been cordoned off to insure Lieutenant Engiles some measure of privacy. On April 8, 1982, Smith, Engiles, and some other officers attended an awards dinner at a nearby officers' club. Lieutenant Engiles testified that, after returning to the tent later that evening, Smith had entered her portion of the tent in the dark, placed one or both hands on her right arm, and pulled it back. As he did so, her finger tips felt pubic hair, and the palm of her hand touched an erect penis. She jerked her arm away and told appellant: "Get out of here, get away. Get out of here, leave me alone." However, appellant did not leave immediately and made a salacious comment to her. After she had told him to leave several more times, he left her end of the tent.

Lieutenant Smith testified in his own defense and denied that this incident had ever occurred. The court members, however, found him guilty as charged.

### B

Several weeks after Smith had been tried, his civilian defense counsel, Mr. Thomas L. Frazier, was speaking with a student whom he taught in a course at Monterey Peninsula College. This student, Specialist Five Kathryn Libra, was a legal clerk in the office of the staff judge advocate at Fort Ord and was responsible for contacting prospective court-martial members, monitoring their availability, receiving their requests for excusals, and locating replacement members. In the course of her conversation with the lawyer, Libra

---

1. *United States v. DuBay,* 17 USCMA 147, 37 CMR 411 (1967).

informed him that she had been directed by her superiors to place female members on appellant's court-martial. Mr. Frazier reported this information to appellant and to his military defense counsel. Thereafter, further information was obtained for submission to the Court of Military Review.

From the evidence obtained after trial, it appears that at Fort Ord court-martial panels sat for 4-month terms. About a month before the end of a term, the criminal law division of the staff judge advocate's office would request each of seven special court-martial convening authorities at the post to nominate potential court members in each rank and grade.

On April 19, 1982, Colonel Jack P. Hug, the staff judge advocate, wrote a memorandum to Major General Ayers, who was then the general court-martial convening author-

ity, and requested that he select one general court-martial panel and two special court-martial panels to sit for a period of 4 months. The next day, Colonel Hug sent another memorandum to General Ayers and requested selection of additional enlisted members, especially from the grades of E-4 through E-7, "to obviate the appearance of any systematic exclusion of enlisted personnel." Both memoranda advised General Ayers to indicate his selections by placing a letter—A, B, C, and so on—in front of the name of the designated members. Neither memorandum intimated that race or gender should be considered as a selection factor.

As a result of this process, General Ayers created this general court-martial panel and list of alternates:

(A) General Court-Martial
1. COL Glenn G. Finkbiner
2. COL Thomas G. Lightner
3. LTC Cyrus N. Shearer, III
4. LTC William H. Kinard, III
5. MAJ Dennis R. Dodd
6. MAJ Dennis M. Savage
7. CPT Willis P. Denny
8. CPT Richard J. Pevoski
9. 1LT George J. Papageorge
10. 2LT Gloria A. Dodd

(F) Alternate Court Members
1. COL Raymond F. Cole
2. COL Leroy H. Fargason, Jr.
3. LTC David King
4. LTC John N. Dailey
5. MAJ Amos D. Giron
6. MAJ (P) John M. Moerls
7. CPT James G. Johnson
8. CPT Robert N. Coley
9. 1LT Sheryl A. Lynch
10. 1LT Mary J. Mason
11. 2LT Bruce W. Parsons
12. 2LT David E. Godfrey
13. CW2 Wesley C. Wolfe
14. CW2 Kenneth R. Kennell

Under the procedure that prevailed at Fort Ord, Specialist Libra would telephone the members of a court panel to which a case had been referred for trial. If a member asked to be excused, he usually would submit a written request to Libra. She compiled these requests, together with the original court-martial convening orders, any requests for enlisted members, and the list of alternate members. Then, by telephone, she would determine which alternate members were available to act as re-

placements. Typically, if a member was excused, the replacement would be of the same rank. For example, if a major was excused, another major would be appointed as the replacement.

When an alternate court member was available for duty, Specialist Libra would place a check mark next to his name on the list of alternate members. Almost without exception, the general court-martial convening authority selected as replacements

the alternate members who had the marks before their names.

According to her affidavit SP–5 Libra was convinced that a policy existed at Fort Ord to select certain members for particular cases. For example, in one case, where the accused was a black soldier named Anthony Bass, who was charged with aggravated assault on a white soldier, she had been "instructed by a member of the prosecution to ensure that black solders were on the panel because there had been allegations that the charges were based on a racial incident." She complied and typed a list of alternate members, including two blacks; and they were ultimately selected by the convening authority.

She also stated:

By the time of *United States v. 2LT Rickie D. Smith*, the selection of court members had become a "game" for the trial counsel. Court-martial panels were tailored according to the needs of the case. Rape and sexual assault cases and cases where the accused was black were the two most specific types of cases where the panel composition was tainted. The Criminal Law Division attempted to insure that at least two women would sit on sex cases so at least one would survive a peremptory challenge and join the panel in deliberations. The Criminal Law Division also insured that blacks would sit on cases with a black accused. When I was informed that a court panel was needed, I would inform the trial counsel and/or Major Goo [Chief of the Criminal Law Division] regarding the members on the original orders and the possible replacements. Several "hard core" officers were in high demand. One panel member, a lieutenant colonel, had a reputation for being an easy peremptory challenge by the defense. The situation got to the point where the lieutenant colonel would have his driver stand by so he could return to his duties as a battalion commander after the peremptory challenge. Only 10% of the time that the lieutenant colonel was on court-martial duty did he actually sit on a case. The remaining time he was excused as a peremptory challenge.

\* \* \* \* \* \*

When I was informed of the need for a court panel in *United States v. Smith,* I screened all the court members on the basic convening order. Only two were available. The others (8 out of 10) either had knowledge of the case, knew the victim, or were unavailable due to duty commitments during the time of the trial. The one female officer on the court panel (2LT Gloria Dodd) was excused because, as the DISCOM Brigade Adjutant, she had knowledge of the case. Also, she was a member of the same unit as the accused. Following the traditional procedures for replacements in sex cases, I called the other two female court members; however, neither was available. I spoke with SFC Garnett [her supervisor] and MAJ Goo concerning the composition of the *Smith* panel. They did not tell me to find any lieutenant to replace 2LT Dodd; rather, I was informed to try contacting the females on the previous court panels. I did; however, none were available. I again informed SFC Garnett of the lack of any available female court members. He instructed me to utilize the female nominations of court members that were being compiled for a future panel change. After calling all the female officers senior in rank to the accused, only one was found to be available (CPT Belz). Due to the possibility of peremptory challenges from the defense, I was instructed to have at least two female officers on the court panel. I spoke with CPT Dennis P. Casey, Headquarters Command trial counsel, about the situation with the female court members. He suggested the names of several females from his command who would be "hardcore" and possibly would make good court members. I made several phone calls. In one of these phone calls, I talked to the female company commander of the 54th Military Police Company. She was not available. MAJ Goo told me to recontact her and tell her that

she would be on the court though the GCMCA had not made any decision on this matter. I finally found 1LT Melanie J. Smith (now married and named Twomey), another military policewoman, to be available. Her name was inserted into the alternate court member master list along with CPT Belz's name for selection by the Commanding General. According to our practice, I placed pencil "X" marks next to the name of each replacement, including the female officers. The paperwork was sent to the Commanding General for "selection" and he chose each alternate according to the pencilled checkmarks.

None of Specialist Libra's superiors acknowledged existence of the policy which she described; but they could not explain why she had the belief that it existed. Captain Wayne E. Anderson, the senior trial counsel at Fort Ord, stated:

Although there was no established policy, *we thought it was a good idea to have females on sex cases in order to avoid any idea of exclusion.* I never set this policy. However, if there was a policy, I thought it made for a broad cross section of the community. *Female members made for a better representative sample especially in sex cases due to the sexual issues.*

(Emphasis added.)

Some circumstantial evidence tends to indicate that in some cases members were selected in conformity with the alleged policy. For example, appellate defense counsel indicate in their final brief in this Court—without contradiction by the Government—that a review of all Fort Ord appointing orders located in the files of the Clerk of the Army Court of Military Review for calendar years 1982 and 1983 indicated that, out of ten cases involving sex offenses, there were female court members in at least six.[2]

In Smith's case, the charges were referred to a court-martial that had the ten

panel members who had been chosen by General Ayers in April 1982. One of these was a woman—Second Lieutenant Dodd. However, she had had some prior contact with the case, since she had administered the oath to Smith's commander when he preferred the charges. Indeed, for a variety of reasons, nine of the original ten members had to be excused from court duty. Consequently, Specialist Libra discussed this problem with her supervisor, Sergeant First Class Garnett, who was the noncommissioned officer in charge of the criminal law division in the office of the staff judge advocate. Although Garnett denies that he instructed Libra to find female members, she set out to follow what she believed to be the office policy of including female court members in cases which involved a sex offense.

At this time, Specialist Libra was teaching her job to another legal clerk, Specialist Five Lisa Lattimore. She instructed Lattimore that women officers would sit on Smith's case because it involved a sex crime with a female victim. Specialist Lattimore observed Libra as she contacted alternate court members in an effort to find two female members.

Libra had encountered problems in obtaining the female court members. She contacted two—presumably Lieutenant Lynch and Lieutenant Mason, who were on the list of alternate court members originally selected by General Ayers—but neither was available. She also attempted without success to contact female officers who had sat on previous court-martial panels or who had been nominated for a future court-martial panel. After calling all the female officers senior in rank to appellant, Libra could locate only one—Captain Cheryl L. Belz—who was available.

During this time, Captain Toni D. Allen, a female defense counsel, visited the office of the staff judge advocate to drop off some papers and to talk with the trial counsel. While there, she "heard a female

---

**2.** In one of the other four cases, no information was available. Furthermore, in three of the cases, the original panels included at least one female member who was subsequently excused and replaced by another female court member.

clerk, probably Specialist ... Libra, say" jokingly: "We're looking for women for Ricky Smith's jury. Hey, Captain Allen, you want to be on the jury?" However, Captain Allen did not mention this off-hand remark to Captain Richard Pocker, Smith's counsel, prior to the court-martial.

Specialist Libra was not satisfied to have only one female court member, because—as mentioned in her affidavit—the defense might use its one peremptory challenge to excuse that person and have an all-male panel. Therefore, Libra went to discuss female members with Captain Dennis P. Casey, the Headquarters Command trial counsel; and she asked him for some suggestions of female officers to sit on a case. Captain Casey did not know whether she was acting independently or pursuant to someone's instructions; but he did not think it was unusual that she asked him for female nominees. He was aware that Smith's case involved a sex crime; and he thought female members would be "a nice touch." He gave three names to Specialist Libra; and according to his affidavit:

> All three of these women were military police and I referred to them as "hardcore." As a trial counsel, you want court members who are "hardcore." However, I thought that any of these women would be intelligent and fair members who could acquit the defendant if the evidence was not there.

As a result of Captain Casey's nominations, Libra found Lieutenant Melanie J. Smith was available. In order to make room for this addition, Specialist Libra deleted from the alternate court member master list the name of Colonel Fargason, who was the provost marshal at Fort Ord. She also typed a memorandum for signature by the staff judge advocate, Colonel Hug, requesting the convening authority to excuse nine members from the court-martial panel and to select replacement members. The memorandum contained no reference to race or sex as a selection factor; and it did not suggest that the court-martial panel should constitute a cross-section of the military community.

To this memorandum, Specialist Libra attached a list of alternate court-martial members derived from the alternates selected by General Ayers in April 1982, court members who sat on other panels, and the two new female nominees—namely, Captain Belz and First Lieutenant Melanie Smith. In accord with office practice, she designated the replacement alternate members with a check mark.

Specialist Libra forwarded the memorandum and alternate list to her supervisor, Sergeant First Class Garnett. From his examination of the documents, he did not realize that she had deleted Colonel Fargason's name from the alternate list or that she had added the names of Captain Belz and First Lieutenant Melanie Smith. Major Goo, Chief of the criminal law division, also reviewed the documents but did not notice Libra's revision. Ultimately, the memorandum and alternate list, including the two new female members, were forwarded by Colonel Hug to Major General James E. Moore, Jr., who had become the convening authority less than 2 months before.

For "reasons ranging from retirement, to PCS, to prior knowledge of the case," General Moore excused nine of the ten officers who had originally been appointed to the court-martial panel. He observed that the list of alternate court members which had been presented to him "bore check marks before the names of those members who were available." According to General Moore:

> My philosophy regarding selection of court panels involves striking several balances. I look at age because I believe that it is associated with rank and experience. I look for a spread of units on the panel to include division units, non-division units, and tenant activities. I look at the types of jobs and positions of individuals in an effort to have a mix of court members with command or staff experience. I also look for some female representation on the panel. At no time have I had a concern for minority representation based upon race. *In sex cases,*

*however, I have a predilection toward insuring that females sit on the court. I did not generally articulate nor did I state this preference to Colonel Jack Hug regarding the Smith case.*

(Emphasis added.) Although he did not know why two available females were included on the alternate list, Major General Moore decided to select them as court members because Smith's case involved a sex crime. Accordingly, he noted these and six other selections by writing his initials before each of the selected alternates. With two exceptions, General Moore selected all the alternate members who had check marks before their names.

When General Moore sent back these documents to the staff judge advocate's office, the criminal law division began to prepare amending court-martial convening orders. Specialist Libra erased all of the penciled check marks from the original alternate list; so the xerox copy of the list in the allied papers does not reflect these marks.

Because of some problems with the availability of Colonel Pellicci and Lieutenant Colonel Wylie, Colonel Hug sent another memorandum to General Moore to excuse and replace these officers. Using his initials, General Moore selected two other male members.

As finally convened, the court-martial panel consisted of one person—Major Savage—from the original court-martial panel; three persons—Lieutenant Colonel King, Lieutenant Colonel Dailey, and Major Giron—from the alternate list; and five persons—Colonel Graham, Colonel Harris, Captain Belz, Captain Rice, and First Lieutenant Melanie Smith—who had not been on either list. Belz and Smith were female.

When appellant's court-martial was finally convened, no challenge was made to the court-selection procedure. Later, after *voir dire* of the nine members, trial counsel peremptorily challenged Captain Rice and the defense peremptorily challenged Lieutenant Colonel Dailey. Thus, appellant, who is black, was tried before a panel of

seven officers, two of whom—like his alleged victim—were white females.

## II

■ The Sixth Amendment grants defendants in criminal cases the right to a jury trial. *See also* U.S. Const. art. III, § 2, 3d para. This right includes a requirement that the jury be drawn from a representative cross-section of the community. *Duren v. Missouri,* 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979); *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). However, the right to trial by jury has no application to the appointment of members of courts-martial. Ex Parte Quirin, 317 U.S. 1, 40, 63 S.Ct. 2, 16, 87 L.Ed. 3 (1942); *Ex Parte Milligan,* 71 U.S. (4 Wall.) 2, 123 (maj. op.), 137–38, 18 L.Ed. 281 (sep. op.) (1866); *United States v. Kemp,* 22 USCMA 152, 154, 46 CMR 152, 154 (1973).

"[I]ndeed, Article 25 of the Uniform Code, 10 USC § 825, contemplates that a court-martial panel will not be a representative cross-section of the military population." *United States v. Santiago-Davila,* 26 M.J. 380, 389 (CMA 1988). That article prescribes that, "[w]hen convening a court-martial, the convening authority shall detail as members thereof such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." Art. 25(d)(2), 10 U.S.C. § 825(d)(2).

Although Congress authorized military commanders to depart from the norm of representativeness in selecting the members of a court-martial, this Court, by divided vote, has held on one occasion that a convening authority might use a criterion not specified by Article 25 in order to have a more representative panel. *United States v. Crawford,* 15 USCMA 31, 35 CMR 3 (1964). There, the convening authority intentionally selected a black to serve as a court member where the accused was black. In upholding this selection, Chief Judge Quinn emphasized that, "[i]f deliberately to include qualified persons is

discrimination, it is discrimination in favor of, not against, an accused. Equal protection of the laws is not denied, but assured." *Id.* at 41, 35 CMR at 13. Judge Kilday "concur[red] with the Chief Judge in his conclusion and the reasoning by which he reached the same." *Id.* at 49, 35 CMR at 21.

Judge Ferguson, on the other hand, asserted in *Crawford* that a convening authority is not free to "ever select a member of a court-martial of the same race as the accused solely on the grounds of that race," *id.* at 57, 35 CMR at 29. He observed that

> [w]hile, because of the nature of our national development, most cases have involved *exclusion* of Negroes from juries, the whole point of the discussion in this area is that race is an impermissible criterion for selection of jurors. In the administration of justice, we are to all be considered, not as Negroes, Whites, Chinese, Jews, or Christians, but as Americans.

*Id.* at 58, 35 CMR at 30.

■ Appellant is black; and if the convening authority had intentionally selected black officers as members of the court-martial panel, *Crawford*'s holding would apply. Moreover, if appellant were a female whose case had been referred for trial and the convening authority had appointed female members, the rationale of *Crawford* would apply. In short, we infer from *Crawford* that a convening authority is not precluded by Article 25 from appointing court-martial members in a way that will best assure that the court-martial panel constitutes a representative cross-section of the military community.

■ As we interpret Article 25 in light of *Crawford*, Congress has not required that court-martial panels be unrepresentative of the military population. Instead, Congress has authorized deviations from the principle of representativeness, if the criteria of Article 25 are complied with. Thus, a commander is free to require representativeness in his court-martial panels and to insist that no important segment of the military community—such as blacks, Hispanics, or women—be excluded from service on court-martial panels.

We are aware that at times there have been experiments in the armed services with some form of random selection of court-martial members. In view of *Crawford*, it would appear that even this method of selection is permissible, if the convening authority decides to employ it in order to obtain representativeness in his court-martial panels and if he personally appoints the court members who have been randomly selected.

■ The defense complains that Article 25 implicitly prohibits use of gender in the selection of court members and also that such use is a violation of the equal-protection guarantees implicit in Fifth Amendment due process. As we already have indicated, to some extent *Crawford* undermines these contentions. In our view, a convening authority may take gender into account in selecting court members, if he is seeking in good faith to assure that the court-martial panel is representative of the military population.

Government appellate counsel also have suggested that Article 25 itself supports use of gender in the selection criteria. Their argument is that a female, as such, has unique "experience" within the meaning of Article 25(d)(2). While in some ways their "experience" may provide females a unique perspective, we do not believe that this was the sort of "experience" which the drafters of Article 25 of the Uniform Code had in mind. Instead, military experience was what they contemplated. We note, too, that the majority in *Crawford* never claimed that a black member was properly appointed to that court-martial because he had unique "experience"; and yet if the Government's interpretation of Article 25(d)(2) is correct, it would seem that the "experience" of a black, Hispanic, or a member of some other racial or ethnic group could also be viewed as satisfying this criterion.

■ The Government's argument does, however, point to our major concern in this case. For whatever reason, the unique "experience" of females apparently was viewed at Fort Ord as being relevant *only* in cases involving sex offenses. Thus, as appellant complains, the policy applied in selecting court members was not designed to provide him or other males accused of sex crimes with a more representative court-martial panel. Instead, it seems to have been intended to "achieve a particular result as to findings or sentence"; this is prohibited. *United States v. McClain*, 22 M.J. 124, 132 (CMA 1986).

The premise underlying selection of two female members for appellant's trial was that these members would have a unique ability to understand the testimony of the victim. From General Moore's statement, it would appear that he, too, shared that premise. Of course, no one can predict actually how jurors or court members will decide a case; and it may be true that in some sex cases female jurors are more skeptical about the claims of a female victim than male jurors would be. However, some take a different view as to the likely behavior of female jurors or court members—as is reflected in this exchange in the statement of Lisa Lattimore:

Q: Do [you] think women members sitting on a sex case would be more sympathetic to the accused or to the victim?

A: *To the victim.*

(Emphasis added.)

This Court constantly has endeavored to assure that "court packing" does not occur in courts-martial—or even seem to occur. The developments in this case, as revealed after trial, indicated that the female members were named to help assure a particular outcome. The circumstances are too akin to those in *McClain* for us to allow the findings and sentence to stand.

### III

■ A convening authority is entitled to assistance from his staff members in appointing the members of a court-martial.

*Cf. United States v. Kemp, supra.* However, a trial counsel who is engaged in prosecuting the accused should not participate in nominating or selecting the members of a court-martial he is involved in. As we observed in *United States v. Marsh*, 21 M.J. 445, 447 (CMA), *cert. denied*, 479 U.S. 1016, 107 S.Ct. 666, 93 L.Ed.2d 719 (1986): "We believe it is well-established in military law that the trial counsel, being a partisan advocate, can play no part in the selection of court members."

Similarly, in *United States v. Crumb*, 10 M.J. 520 (ACMR 1980)—which involved the practice at Fort Lewis, Washington, of trial counsel nominating a replacement for a court member excused by the convening authority—Senior Judge Jones in a concurring opinion observed:

By involving the Chief Trial Counsel in the "culling" process and the Trial Counsel in the replacement scheme, ... the authorities needlessly injected an appearance of evil into the procedure that should have been avoided. There is no place for the use of partisan government advocates in the sensitive area of selection of court members.

*Id.* at 527–28. We agree.

Here, it seems clear from the affidavit of Specialist Libra and from other appellate exhibits that trial counsel at Fort Ord were not adequately insulated from the process of selecting court-martial members. For example, Captain Casey, who was a trial counsel at Fort Ord—although not involved directly in Smith's trial—should not have been suggesting female members to Specialist Libra. We do not know what he meant when he referred to his three female nominees as "hardcore"—a term which appears in several of the appellate exhibits. According to the Court of Military Review, his "use of the term 'hardcore,' although appearing to be sinister, apparently meant only that the recommended officers were dedicated and would perform their duty competently." 18 M.J. at 707. In the particular context of this case and especially since the female nominees were all military police officers and were being recom-

mended by a prosecutor, we consider this interpretation by the court below to be implausible.

In his sworn statement, Captain Casey admits that he referred to his three nominees as "hardcore"; but he added: *"However, I thought that any of these women would be intelligent and fair members who could acquit the defendant if the evidence was not there."* Casey's use of the word "[h]owever" is an implicit recognition that most court members described as "hardcore" would be considered more prone to convict an accused and adjudge a heavier sentence.

In situations like this, we have always been especially concerned about the appearance of evil. Trial counsel in a court-martial is an advocate, who in his representation of the Government is usually seeking a conviction. The members of a court-martial—like the members of a civilian jury—are supposed to be fair and impartial. If a prosecutor is involved in selecting the members, it seems likely that, due to his institutional bias, he will want to have a certain type of member. Moreover, to the extent that the prosecutor participates in this selection process, it is inevitable that the public will suspect that the membership mirrors his preference.

Perhaps in this case, Captain Casey's participation in selecting one of the court members ultimately had no impact on the fairness of the court. Perhaps, too, the female member he recommended was as fair to appellant as any other officer would have been. Indeed, neither she nor the other female was peremptorily challenged by the defense. However, we need not indulge in speculation in this regard, because we are convinced that the selection of the entire court-martial panel was tainted here by the application of the Fort Ord policy of selecting female court members for sex cases.

## IV

The decision of the United States Army Court of Military Review is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

COX, Judge (concurring):

As I read Chief Judge Everett's opinion, it stands for two basic propositions of law regarding appointment of court members. Proposition one is that members may be selected on the basis of sex, race, religion, or rank if the convening authority "is seeking in good faith to assure that the court-martial panel is representative of the military population." 27 M.J. 242, 249. This rule is consistent with the view that I expressed in *United States v. McClain,* 22 M.J. 124 (CMA 1986). "The deliberate selection ... of a certain class of servicepersons for the purpose of increasing the severity of the sentence is wrong." *Id.* at 133. The same rationale applies to the selection of members who may be more likely to convict.

In any event, anyone who believes that women are more likely to empathize with the victim of a sex crime is purely speculating. My experience as a trial judge with jury members who are women has led me to the realization that they are no more biased for or against the victims or the accused than are men. The sex of the juror is an irrelevant factor, as is the sex of the victim. It is the quality of the Government's evidence and the defenses in response which are important. Women should be selected for the same reasons that men are, because of their "age, education, training, experience, length of service, and judicial temperament," and for no other reasons. Art. 25(d)(2), Uniform Code of Military Justice, 10 U.S.C. § 825(d)(2).

The second proposition of law is "that the trial counsel, being a partisan advocate, can play no part in the selection of court members." *United States v. Marsh,* 21 M.J. 445, 447 (CMA), *cert. denied,* 479 U.S. 1016, 107 S.Ct. 666, 93 L.Ed.2d 719 (1986). That rule was violated here.

Judge Sullivan has criticized Chief Judge Everett and me for our "tortuous interpre-

tations of Article 41(b)," *United States v. Carter*, 25 M.J. 471, 479 (CMA 1988), and perhaps he is right. But if this case does not prove one of my basic premises, that "[t]he Government has the functional equivalent of an unlimited number of peremptory challenges," *id.* at 478, nothing ever will.

The irony of the case is that this issue would never have been uncovered if the legal clerk had not been taking a college course from the civilian defense counsel. I hope and I believe that this staff judge advocate and this convening authority would have been mortified if they had been aware of the cavalier and disrespectful manner by which the court members were being nominated. I know that young judge advocate officers love witty exchanges, practical jokes, and a sense of the macabre in their humor; and normally little if any significance should be given use of terms like "hardcore" to categorize a potential court member. However, the selection process is not a "game" and is no place to use pejorative terms to describe potential members.

Those responsible for nominating court members should reflect upon the importance of this task. It is a solemn and awesome responsibility and not one to be taken lightly or frivolously. It is a responsibility that Congress has entrusted to convening authorities and has not required some other method of selection, such as random choice. Even so, it is the most vulnerable aspect of the court-martial system; the easiest for critics to attack. A fair and impartial court-martial is the most fundamental protection that an accused servicemember has from unfounded or unprovable charges. There is a duty to nominate only fair and impartial members.

Because it is impossible to determine whether any prejudice resulted, I join in reversing this conviction.

SULLIVAN, Judge (concurring in the result):

I agree with my Brothers' conclusion that the facts in this case indicate that female members of this court-martial were named to assure a particular outcome. *See United States v. McClain*, 22 MJ 124, 132 (CMA 1986). This is wrong, so the decision below must be reversed.