**UNITED STATES**

v.

**John R. LYNCH, Lieutenant Commander, U.S. Coast Guard.**

**CGCM 0047.**

**Miscellaneous Docket No. 001–69–91.**

U.S. Coast Guard Court of Military Review.

July 21, 1992.

---

3. Art. 1(1), UCMJ, 10 U.S.C. § 801(1).

580

Trial Counsel: CDR Arthur R. Butler, USCG.

Assistant Trial Counsel: LT David Martin, USCG.

Civilian Defense Counsel: Jerome Flanagan, Esquire.

Assistant Civilian Defense Counsel: Brian P. Flanagan, Esquire.

Detailed Defense Counsel: LCDR Michael L. Tagg, USCG.

Civilian Appellate Defense Counsel: Kevin J. Barry, Esquire.

Appellate Defense Counsel: LCDR G Arthur Robbins, USCG.

Appellate Government Counsel: LT Garland M. Walker, USCGR.

Before En Banc [1] BAUM, BRIDGMAN, GRACE, SHKOR and BASTEK, Appellate Military Judges.

BAUM, Chief Judge:

Appellant, a Coast Guard lieutenant commander, was tried by a general court-martial on charges stemming from the grounding of USCGC MESQUITE (WLB 305). As commanding officer, Appellant was charged with one specification of dereliction of duty in violation of Article 92, Uniform Code of Military Justice (UCMJ) 10 U.S.C. § 892 and one specification of negligently hazarding a vessel in violation of Article 110, UCMJ, 10 U.S.C. § 910. He pled not guilty to both offenses, was acquitted of dereliction of duty, and convicted of hazarding a vessel. The court sentenced Appellant to a reprimand and reduction in lineal position by 150 numbers, which was approved and ordered executed by the convening authority. This sentence is below that which requires review by a Court of Military Review under Article 66, UCMJ, 10 U.S.C. § 866. Discretionary referral to the Court under Article 69, UCMJ, 10 U.S.C. § 869, was effectuated, however, by the General Counsel, Department of Transportation in his capacity as Judge Advocate General of the Coast Guard. That article, as recently amended, limits this Court to "action only with respect to matters of law," [2] rather than the broader factual and legal review formerly conducted under Article 66 for such cases.

Appellant has assigned eight errors, the first five of which were briefed and orally argued to the Court at the United States Coast Guard Academy, New London, Connecticut.[3] Subsequently, by motion, Appellant submitted the last three assignments as supplemental summary assignments of error. The eight assignments are as follows:

## I

APPELLANT WAS PROSECUTED AND CONVICTED AS A RESULT OF UNLAWFUL COMMAND INFLUENCE BY THE COMMANDANT OF THE COAST GUARD.

## II

APPELLANT WAS DENIED HIS RIGHT TO CONFLICT–FREE MILITARY COUNSEL BY THE STAFF JUDGE ADVOCATE DETAILING COUNSEL FROM HIS OWN STAFF TO REPRESENT APPELLANT AT THE FORMAL INVESTIGATION.

## III

APPELLANT WAS DENIED DUE PROCESS OF LAW BY THE BLANKET EXCLUSION OF OFFICERS NOT HAVING SERVED AS COMMANDING OFFICER AFLOAT FROM THE PANEL OF COURT–MARTIAL MEMBERS.

## IV

STAFF JUDGE ADVOCATE CONFLICT OF INTEREST MANDATES SETTING ASIDE ACTION OF THE CONVENING AUTHORITY.

1. Judge Edwards did not participate.

2. Article 69(e), UCMJ.

3. At the invitation of the Superintendent, United States Coast Guard Academy, and without objection by the parties, the Court heard oral argument at the Coast Guard Academy as part of "Project Outreach," a program instituted by the United States Court of Military Appeals to take appellate hearings to locations outside the Washington, DC area and, thus, make the public more aware of the military justice appellate process. Oral argument in this case was held before approximately 200 people, the majority of whom were third-year Coast Guard Academy cadets with course obligations covering military justice. Others in attendance included some of the members of the prosecution and defense teams from the trial of this case: Academy faculty and staff and their guests; Coast Guard law specialists from Governors Island, New York, Boston, Massachusetts and Newport, Rhode Island; Navy judge advocates from the Submarine Base, Groton, Connecticut; and retired Coast Guard personnel and their families. After the hearing adjourned, in furtherance of "Project Outreach" objectives, the judges entertained questions from the audience not pertaining to the case.

## V

APPELLANT'S POST–TRIAL REPRE-SENTATION WAS SUBJECTED TO UNLAWFUL GOVERNMENTAL IN-TERFERENCE.

## VI

APPELLANT'S CONVICTION MUST BE SET ASIDE BECAUSE DUE PROCESS REQUIRES THAT A JUDGE IN A CRIMINAL CASE HAVE A FIXED TERM OF OFFICE. *BUT SEE UNITED STATES V. GRAF*, 32 M.J. 809 (N.M.C.M.R.1990), *PETITION GRANT-ED*, 33 M.J. 189 (C.M.A.1991) (MEM).

## VII

APPELLANT'S COURT–MARTIAL LACKED JURISDICTION BECAUSE THE MILITARY JUDGE WAS DESIG-NATED IN VIOLATION OF THE AP-POINTMENTS CLAUSE OF THE CON-STITUTION.

## VIII

THE COURT OF MILITARY REVIEW IS WITHOUT POWER TO AFFIRM THE FINDINGS OF GUILTY AND SENTENCE BECAUSE THE APPEL-LATE MILITARY JUDGES ARE AS-SIGNED IN VIOLATION OF THE AP-POINTMENTS CLAUSE OF THE CON-STITUTION.

### *Background*

In December 1989, USCGC MESQUITE (WLB 305), a 180–foot buoy tender com-manded by Appellant, was assigned to as-sist another buoy tender in decommission-ing certain Great Lakes navigational buoys before the winter freeze and icing over of the Lakes. In furtherance of this assign-ment, shortly before midnight on 3 Decem-ber 1989, MESQUITE was underway *en route* to a buoy marking a rock shoal off Keweenaw Point, Lake Superior, Michigan. The hazardous enterprise of closely ap-proaching the buoy in shoal waters, hook-ing into the buoy, and hauling it out of the water was accomplished without incident in the early morning hours of 4 December 1989. Believing the most dangerous as-pects of the project essentially completed, the Appellant, who had been on the bridge overseeing the operation, permitted his spe-cial navigational/operational team to leave the bridge. The officer of the deck throughout this operation was an ensign newly qualified in that watch officer posi-tion. After assuring that the officer of the deck understood and was in the process of carrying out Appellant's orders to back the ship 1,000 yards and then turn to a prede-termined course for MESQUITE's next des-tination, the Appellant left the bridge also. Those orders rested on an assumed position of the ship which, as found by the court-martial, was not verified. Due to the ef-fects of wind and current, the vessel was not at the assumed position. When the MESQUITE was turned to the desired course, it was headed directly into harms way. Within minutes after Appellant left the bridge, MESQUITE grounded hard on the rock shoal that had been marked by the buoy. What followed is well described in Appellant's brief:

> The ship's crew went to General Quar-ters and all efforts were made to save the vessel. MESQUITE remained stuck on the shoal, incurring additional damage and flooding as her hull banged against the bottom. Unable to stem the flooding in the engine room, the crew lost use of the engines and the generators; the flooding placed the vessel at risk of cap-sizing and incurring personnel injuries and loss of life. Shortly after 0600, Lieu-tenant Commander Lynch ordered his crew to abandon ship. Though there was no loss of life, subsequent weather conditions rendered MESQUITE a total loss.

Appellant's Brief at 2.

An investigation into the circumstances surrounding the grounding was convened immediately by Commander, Ninth Coast Guard District, the flag officer with direct responsibility over MESQUITE as a unit of the Ninth Coast Guard District. That offi-cer's immediate superior, Commander, Coast Guard Atlantic Area, subsequently took the matter out of the District Com-

mander's hands by convening a formal investigation of the incident. In an affidavit from that officer filed with this Court by Appellant, Commander, Atlantic Area explained that, while he supported the District Commander's initial action, he ordered his own investigation as a compromise step to keep things as close to the field level as possible and still be acceptable to the Commandant of the Coast Guard who had wanted Headquarters to take control of the investigation. Commander, Atlantic Area further states in the affidavit that once his inquiry into the incident was ordered, Headquarters did not seek to influence the way it was resolved.

Upon completion of the investigation, the formal board recommended non-judicial punishment in the form of a letter of reprimand for the commanding officer for dereliction of duty and negligence in the safe navigation of his vessel. Despite that recommendation, Commander, Atlantic Area, after meeting and agreeing with his senior staff, determined that disposition should be by general court-martial. Charges were preferred and an investigation pursuant to Article 32, UCMJ was ordered as a prelude to such a court-martial. Thereafter, as recommended by his staff judge advocate, the instant general court-martial was convened.

### Assignment of Error I

### Asserted Unlawful Command Influence by the Commandant

█ In his first assignment of error, Appellant contends that the referral, conviction, and sentence all flowed from the Commandant's unlawful influence. By initially voicing his desire to have Headquarters investigate and take action on MESQUITE's grounding and by subsequently issuing a personal message to all flag officers, commanding officers and officers in charge of floating units on the subject of cutter grounding which emphasized command responsibility,[4] Appellant submits that the Commandant communicated his

belief that only the most serious mechanisms of the military system could adequately address the grounding of USCGC MESQUITE. As a result, according to Appellant, Commander, Atlantic Area was unlawfully influenced in his decision to refer the case to a general court-martial rather than following the recommendation of the board of investigation.

In response, the Government cites *U.S. v. Allen*, 31 M.J. 572 (N.M.C.M.R.1990), *aff'd*, 33 M.J. 209 (C.M.A.1991) as leading to the opposite conclusion. In that case, the accused contended that actions by the Secretary of the Navy in promulgating new regulations limiting the number of convening authorities who could dispose of national security cases and limiting the exercise of discretion by those convening authorities in disposing of cases, coupled with the Secretary's adamant public disapproval of Department of Justice handling of espionage cases and the sentences adjudged by federal district courts, unlawfully influenced the decision by a subordinate to refer charges of espionage and security violations to a general court-martial. Citing *U.S. v. Betts*, 12 U.S.C.M.A. 214, 30 C.M.R. 214 (1961) and *U.S. v. Rivera*, 12 U.S.C.M.A. 507, 31 C.M.R. 93 (1961), the Navy–Marine Corps Court of Military Review said, "the superior of a convening authority, may issue directives and announce policies for adherence by subordinates as long as those directives do not require the convening authority to abdicate his independent judgment while performing his court-martial responsibilities." *U.S. v. Allen*, 31 M.J. at 592, 593.

Applying that principle to the facts, the Court found that the referral to a general court-martial of serious offenses involving national security matters was valid on its face and not an abuse of discretion. Moreover, any issue of unlawful command influence that may have been arguably raised by the Secretary's actions was sufficiently rebutted by testimony of the convening authority's staff judge advocate indicating

4. A copy of the Commandant's message which was filed by Appellant is attached as an appen- dix.

that the convening authority felt no pressure from the Secretary to make any particular decision in the case. The court was satisfied that there was neither actual nor apparent unlawful command influence, after looking at the convening authority's perceptions with respect to actual influence and public perceptions as to apparent command influence. Citing *U.S. v. Rosser*, 6 M.J. 267 (C.M.A.1979) and *U.S. v. Cruz*, 20 M.J. 873, 890 (A.C.M.R.1985), the Navy–Marine Corps Court of Military Review said, "The test for apparent unlawful command influence ... is whether a reasonable member of the public, if aware of all the facts, would have a loss of confidence in the military justice system and believe it to be unfair," whereas actual unlawful command influence "is based upon considerations from inside the military justice system ... perception of the commander's desires by a participant in the system." *U.S. v. Allen*, 31 M.J. at 590.

The Government argues that *U.S. v. Allen, supra*, in its treatment of unlawful command influence is practically "four square" with the case before us. We agree. Here, we also have a facially valid referral of charges—command negligence and dereliction leading to loss of a ship—universally considered as serious within the sea services. Furthermore, the affidavit from the convening authority clearly states, "Once I took the case, Headquarters did not seek to influence the way I resolved it." Affidavit of Vice Admiral, Howard B. Thorsen, USCG (Ret.) at 3. That affidavit also elaborates on what Admiral Thorsen believed to be the factors prompting the Commandant's initial desire to remove the case from the district, none of which convey a predisposition for ultimate resolution. Rather, the Commandant's concerns appeared to be aimed primarily at avoiding any appearance, or question, of internal coverup of the causes of the grounding from an investigation ordered by the officer with immediate responsibility for the ship. Accordingly, it would be reasonable for Admiral Thorsen to conclude that once he took charge of the investigation and ensured the full facts were brought out, the Commandant's concerns

would have been met without any specific further action being taken. Other than pure conjecture on the part of Appellant, there is no indication whatsoever that Admiral Thorsen was led to believe he should convene a general court-martial for the Commanding Officer. Given the seriousness of the charges, the independent decision of the convening authority to convene a general court-martial, concurred in by his staff, appears not only reasonable but the likely result in any event. Applying *U.S. v. Allen, supra*, we find the evidence presented by Appellant insufficient as a matter of law to raise the issue of actual or apparent unlawful command influence with respect to the referral of charges to a general court-martial.

 Left for consideration is the assertion by Appellant that the Commandant's actions somehow influenced the conviction and sentence by the court members. The Appellant does not contend that the members were aware of the Commandant's early interest in Headquarters action on the case or the convening authority's removal of the investigation from the District Commander's cognizance. Moreover, there is nothing to support a conclusion that these actions influenced the members in any way. Presumably, Appellant's contentions relate only to the effect of the Commandant's message to all commanding officers concerning cutter grounding and the responsibility of all officers exercising command for continued emphasis on prudent, safe and accepted practices while underway.

The Commandant's message led off with a referral to the loss in 1980 of 23 coast guardsmen on the USCGC BLACKTHORN, and reflected on the shortcomings in navigation and bridge procedures that contributed to that loss. It then proceeded to focus on the need for officers in command to personally conduct training sessions for "tightening up our bridge watches where necessary," after noting the recent loss of another buoy tender. Such guidance "to all flag officers, commanding officers and officers in charge of floating units," aimed at avoiding future mishaps at sea, certainly fell within the duties and

responsibilities of the Commandant of the Coast Guard. Indeed, failure to exercise his leadership role in these circumstances might very well have constituted dereliction on his part. In meeting that responsibility, however, great care must be exercised to avoid conveying a desired outcome with respect to disciplinary matters. It is apparent that such care was taken in the crafting of the Commandant's message. While underscoring the causal connection between safety lapses and ship disasters by noting that shortcomings in navigation and bridge procedures contributing to the loss of the BLACKTHORN had been documented in punitive letters at the time, that reference to the BLACKTHORN does not imply the kind of disciplinary actions, if any, expected by the Commandant from the loss of the MESQUITE.

The Government points out that in assessing the possible impact such a communication might have on a particular disciplinary proceeding the courts have established several factors to consider: (1) the type of communication, (2) its content, (3) the person making the communication, (4) the recipient, (5) the timing of the communication, and (6) the reasonable likelihood of prejudice to the accused. *U.S. v. Allen,* 31 M.J. at 592 and cases cited therein.

Here, the message is a Coast Guard wide communication from the Commandant directing bridge-watch training to be conducted within the two weeks following the message. It does not refer to or even intimate desired disciplinary action for the MESQUITE loss. Moreover, the timing of the communication was far removed from Appellant's court-martial, more than four months before referral of charges and over six months before the trial itself. Rather than being tied to the MESQUITE grounding, which occurred two months before the message, the communication was ostensibly prompted by a memorial service the previous weekend for the crewmen lost on the BLACKTHORN in 1980.

■ As for the remaining factor of possible prejudice to the accused at trial, we

agree with the Government's assessment that the reasonable likelihood of such was practically nil. A pretrial motion by the defense to excuse the members and select a new panel was fully litigated and denied by the judge upon his determining that the members were impartial and not predisposed toward any particular finding or sentence. While that motion related to the issue raised in Assignment of Error III concerning court member selection, it was resolved on the basis of extensive *voir dire* examination of the members. Absent an abuse of discretion, the judge's determination with respect to the members' impartiality is dispositive. Accordingly, we find as a matter of law that neither actual nor apparent unlawful command influence, with respect to findings and sentence has been raised by the evidence.

*Assignment of Error II*

*Asserted Denial of Conflict–Free Military Defense Counsel by the Staff Judge Advocate's Detailing of Such Counsel from His Own Staff*

■ Appellant's detailed military counsel represented the Appellant at trial and also earlier at the formal investigation into the grounding of USCGC MESQUITE. Appellant contended at trial that a conflict of interest existed because the detailed counsel worked for the staff judge advocate. As a result of that asserted conflict, Appellant moved to have the staff judge advocate replaced as legal advisor to the convening authority. The military judge denied that motion. Instead of ordering another staff judge advocate, the judge acted in compliance with the guidance of *U.S. v. Nicholson,* 15 M.J. 436 (C.M.A.1983) and *U.S. v. Whidbee,* 28 M.J. 823 (C.G.C.M.R. 1989). After assuring himself that the accused understood the relationship between the staff judge advocate and counsel, the judge required the accused to choose whether he wanted another counsel detailed or to waive any possible conflict and proceed with the counsel already assigned.[5]

5. As the Government points out, detailed military defense counsel had become an associate counsel since Appellant had hired two civilian counsel who also represented him at trial.

On advice of civilian counsel, Appellant refused to choose and stood mute. The military judge treated that action as a choice to proceed with detailed counsel and a waiver of any perceived or potential conflict. We agree with the trial judge's action in resolving this matter and consider any perceived or potential conflict of interest was waived by Appellant's action. Furthermore, despite the waiver, we have reviewed the record for possible prejudice from any conflict and find none. Accordingly, Appellant's Assignment of Error II is rejected.

### Assignment of Error III

*Asserted Denial of Due Process by the Convening Authority's Exclusion from Court Membership of Officers without Experience as Commanding Officer Afloat*

At trial, the accused moved to have the military judge strike the officers chosen by the convening authority for the court and order a new list of potential members selected in accordance with the provisions of Article 25(d)(2), UCMJ, 10 U.S.C. § 825(d)(2) and Rules for Courts-Martial (R.C.M.) 502(a)(1), Manual for Courts-Martial (1984). The cited Code and Manual provisions call for selection of court members who, in the opinion of the convening authority, "are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." Article 25(d)(2), UCMJ. The accused's brief in support of his motion at trial contended that those provisions were violated by the convening authority's having limited the class of potential court members to only those with significant seagoing experience and that as a result all of the officers selected to serve on the court-martial had afloat duty as a commanding officer. He further contended that limiting the court membership in such a way could

serve no other purpose than to improve the prosecution's chances when the charge relates to ship handling. Moreover, according to the accused at trial, such a limitation constituted either "court-packing" or it gave the unmistakable impression of being such.

The military judge deferred ruling until after *voir dire* examination of all the members so he could determine, based on their answers, whether, in fact, the convening authority's method of selecting members had resulted in prejudicing the substantial rights of the accused. As previously indicated, the judge ultimately denied the accused's motion at trial, notwithstanding defense evidence that the convening authority had directed his administrative officer to provide him with a list of potential members for his selection from "only officers who had either buoy tender or other significant seagoing experience." Defense Exhibit A.[6] In so ruling, the judge found "that there is no evidence that the convening authority had packed the court with members who were predisposed to either convict the accused or to impose a harsh sentence in the event of a conviction." Record at 35. The responses to the *voir dire* questions support the judge and, accordingly, we are bound by his finding in that regard. Indeed, detailed defense counsel acknowledges in a post-trial submission to the convening authority a belief that the convening authority's action limiting the pool of prospective members, as he did, was "with the best to [sic] intentions, and with the knowledge that the court that was selected was completely fair and impartial." Detailed Defense Counsel's Letter of 17 January 1991 Submitting Matters Pursuant to R.C.M. 1105 at 3.

In light of the valid finding of member impartiality, the issue for this Court is whether, notwithstanding that finding, the panel must be disqualified as a matter of

---

**6.** Although the officers who ultimately sat on the court all had experience as seagoing commanding officers, and the Appellant has framed his assignment in terms of the convening authority excluding officers not having served as commanding officers afloat, it is not clear from the evidence that such were the instructions from the convening authority. Defense Exhibit

A indicates the prospective members were to be drawn from those with "either buoy tender or other significant seagoing experience." On the other hand, it appears from Defense Exhibit B that the convening authority's administrative officer may have believed the pool was to be limited to officers with command afloat or buoy tender experience.

law because of the selection process limiting membership to only those with significant seagoing experience. While there are no case decisions directly on this point, there are cases that say deliberate exclusion from a court of officers below a certain rank violates Article 25, UCMJ; *U.S. v. Daigle,* 1 M.J. 139 (C.M.A.1975); *U.S. v. Greene,* 20 U.S.C.M.A. 232, 43 C.M.R. 72 (1970); *U.S. v. Autrey,* 20 M.J. 912 (A.C.M.R.1985); *U.S. v. James,* 24 M.J. 894 (A.C.M.R.1987). No question has been raised with respect to the rank of the court members in this case, so the decisions bearing on exclusion in that manner have no direct applicability here. In fact, Article 25(d)(1), UCMJ cautions that, "When it can be avoided, no member of an armed force may be tried by a court-martial any member of which is junior to him in rank or grade." That precept, which required the exclusion from consideration for the instant court-martial of all officers below the rank of lieutenant commander and those in that rank who were junior by signal number to the Appellant, was met since all the court members were senior to the Appellant.

■ Contrary to the civilian practice of random jury selection, the Uniform Code of Military Justice commits selection of court-martial members to the sound discretion of the convening authority. He must pick those best qualified, applying the Article 25(d)(2) criteria previously outlined. In so doing, however, "[m]ethods of selection which are designed to produce a court membership which has, or necessarily results in, the appearance of a 'packed' court are subject to challenge." *U.S. v. Crawford,* 15 U.S.C.M.A. 31, 35 C.M.R. 3, 6 (1964). That principle was echoed by Judge Kilday in his separate concurring opinion in *Crawford, supra,* where he said: "He [the convening authority] may not abuse that discretion [in selecting members he deems best qualified] by the choice of individuals who are not fair and impartial. He can no more 'stack' the court against the interests of the accused than he can pollute the court by command control or influence against him." 35 C.M.R. at 19–20.

■ *U.S. v. Crawford, supra,* thus, provides the basic guidance for looking at the convening authority's requirement of sea experience as a qualification for prospective members. As previously noted, the judge's ruling effectively determined that the court was not "stacked" against the accused. Such a court, by virtue of the training of its members and their experience as commanding officers, would be better able to understand the evidence and apply it to the standard of care expected of a commanding officer. Any concern that the membership of the court created an appearance of being predisposed against the accused is dispelled by the court's not guilty finding for one of the two charged offenses, and the sentence, which was little more than that authorized for non-judicial punishment.

■ Still remaining, is the question whether there is some other reason for disqualifying the court as a matter of law. Certain language in the "Discussion" paragraph following R.C.M. 912(b)(1) might have applicability. Included in that paragraph is the following: "[m]embers are ... improperly selected when, for example, a certain group or class is *arbitrarily* excluded from consideration...." (Emphasis added.) In defining "arbitrary," Black's Law Dictionary, Special Deluxe Fifth Edition, 1979, says the following: "Means in an 'arbitrary' manner, as fixed or done capriciously or at pleasure. Without adequate determining principle; not founded in the nature of things; nonrational; not done or acting according to reason or judgment...." Given the charges in this case, relating to the grounding and loss of a ship, we do not believe it can be said that the decision to seek officers with seagoing experience to sit in judgment on such charges was in any sense arbitrary. Accordingly, assuming the cited "Discussion" paragraph of the Manual for Courts–Martial is a correct statement of the law, required to be followed, we find that it was not violated by the court selection in this case.

■ The convening authority in complying with the mandate of Article 25, UCMJ sought court members with a certain type of experience. In *U.S. v. Smith*, 27 M.J. 242 (C.M.A.1988), a case cited in Appellant's trial brief, the United States Court of Military Appeals looked at a particular kind of experience. The Court said that choosing a woman for court membership because of her "unique experience" as a female was not "the sort of 'experience' which the drafters of Article 25 of the Uniform Code had in mind. Instead, military experience was what they contemplated." *Id.* at 249. We are unaware of any rule or case decision that might restrict the convening authority in his determination of the kind of military experience he deems most appropriate in choosing members best qualified to sit on a court, as long as that experience appears relevant to the matter under consideration and does not indicate a predisposition towards conviction or severe sentencing.

In light of the foregoing, it is our view that the convening authority's decision to select members from among officers with significant seagoing experience was in keeping with the mandate in Article 25(d)(2) to "detail ... members ... [who] in his opinion, are best qualified for the duty by reason of ... experience...."[7] There having been no showing that any of the other criteria of that Article were not met, we find as a matter of law that the selection process utilized for this case did not violate Article 25, UCMJ and, accordingly, did not violate military due process.

### Assignment of Error IV

#### Asserted Staff Judge Advocate Conflict of Interest Mandates Setting Aside Action of the Convening Authority

■ In this assignment of error, Appellant contends that he was denied the opportunity to have an unbiased post-trial recommendation presented to the convening authority pursuant to R.C.M. 1106 because the staff judge advocate, in reviewing his

prior decisions, was personally defending his own prior actions. In so doing, according to Appellant, the staff judge advocate undertook affirmative advocacy. As a result, Appellant submits that the convening authority's action should be disapproved and the record returned for a new action after review and recommendation by another staff judge advocate.

The Government disagrees, stating that the staff judge advocate was not disqualified from providing the required R.C.M. 1106 review and that the staff judge advocate's R.C.M. 1106 recommendation, with two addenda prepared in response to two separate defense submissions, demonstrates that the staff judge advocate was not acting unfairly or unreasonably. We agree with the Government that Appellant received a thorough, fair, and impartial staff judge advocate review. Accordingly, Assignment of Error IV is rejected.

### Assignment of Error V

#### Asserted Unlawful Governmental Interference in the Post–Trial Representation of Appellant

Appellant was provided a substitute defense counsel who assisted him with respect to review action by the Judge Advocate General under Article 69, UCMJ, after the convening authority acted on the record. That assistance consisted of submissions to the Chief Counsel of the Coast Guard and the General Counsel, Department of Transportation. Appellant contends that the Government interfered with the ability of substitute defense counsel to provide effective representation in three ways:

a. by refusing to provide a verbatim record of trial,

b. by failing to permit counsel to rebut the Coast Guard Chief Counsel's Article 69(a) recommendation to the Judge Advocate General, and

---

7. Our decision would be the same whether the court member pool was limited to only officers with command afloat experience, officers with buoy tender experience or officers with significant seagoing experience.

c. by the Chief of Military Justice's attempts to unlawfully chill counsel from vigorously representing Appellant.

We find absolutely no merit to Appellant's assertions. The law does not require a verbatim record in this case, and we find the summarized record that has been prepared to be adequate for our purposes. The Judge Advocate General's referral of the record to this Court has mooted any issue raised concerning the recommended Article 69(a) action and whether counsel was afforded an opportunity to rebut that recommendation. Finally, counsel's assertion that the Chief of Military Justice attempted to chill him in his representation is simply not supported by the evidence. Accordingly, Assignment of Error V is rejected.

### Assignment of Error VI

*Appellant's Conviction Must be Set Aside Because Due Process Requires that a Judge in a Criminal Case have a Fixed Term of Office. But See United States v. Graf, 32 M.J. 809 (N.M.C.M.R. 1990), Petition Granted, 33 M.J. 189 (C.M.A.1991) (MEM)*

### Assignment of Error VII

*Appellant's Court–Martial Lacked Jurisdiction Because the Military Judge was Designated in Violation of the Appointments Clause of the Constitution*

### Assignment of Error VIII

*The Court of Military Review is without Power to Affirm the Findings of Guilty and Sentence Because the Appellate Military Judges are Assigned in Violation of the Appointments Clause of the Constitution*

Assignments of Error VI, VII and VIII, after briefing and consideration in two other cases, were rejected by this Court. *U.S. v. Prive,* 35 M.J. 569 (C.G.C.M.R.1992); *U.S. v. Ryder,* 34 M.J. 1259 (C.G.C.M.R. 1992). Those decisions are dispositive of these assignments.

All assignments of error having been rejected and no errors of law having been found pursuant to our Article 69, UCMJ review, the findings of guilty and sentence as approved below are affirmed.

Judges BRIDGMAN, GRACE, SHKOR and BASTEK concur.

Appendix

Commandant's Message (ALCOAST 005/90)

ROUTINE

UNCLASSIFIED

U S COAST GUARD
HDQTRS TELECOMMUNICATIONS

```
PAGE 01 **ALL STAFF (S*4)** — 005758 06/0143Z
COMDT COGARD WASHING (UNIT TOTAL: 029)
INFO: G-CAS (03) G-CC (01) G-CBU (04) G-CCS (03) G-CPA (01)
 G-CPE (02) G-H (04) G-K (02) G-L (03) G-M (01) G-MP (05)
------------------------ 06/0208Z A1 "B" (TOTAL COPIES: 029)
```

RETRANSMISSION ADMINISTRATIVE MESSAGE

ROUTINE

R 060030Z FEB 90 ZYB PSN 975769M43

FM COMDT COGARD WASHINGTON DC//G-C//

TO ALCOAST

ACCT CG-W2GARC

BT
UNCLAS //N03530//

ALCOAST 005/90
COMDTNOTE 3530
SUBJ: CUTTER GROUNDING
PERSONAL FROM ADM YOST TO ALL FLAG OFFICERS, COMMANDING OFFICERS AND
OFFICERS IN CHARGE OF FLOATING UNITS.

1. THIS PAST WEEKEND I ATTENDED THE MEMORIAL SERVICES FOR THE 23
MEN LOST ON THE CGC BLACKTHORN IN 1980. I COULD NOT HELP BUT
REFLECT ON THE SHORTCOMINGS IN NAVIGATION AND BRIDGE PROCEDURES THAT
CONTRIBUTED TO THAT LOSS AND WAS THE SUBJECT OF SEVERAL PUNITIVE
LETTERS AT THAT TIME.

2. ALTHOUGH OUR NAVIGATION SAFETY RECORD HAS BEEN GOOD THE PAST TEN
YEARS, WE RECENTLY LOST ANOTHER BUOY TENDER. HISTORICALLY,
GROUNDINGS REFLECT EVIDENCE OF LAPSES IN JUDGMENT, IMPRUDENT BRIDGE
MANAGEMENT, OR POOR NAVIGATION AND SEAMANSHIP PRACTICES.

3. ALL OFFICERS EXERCISING COMMAND AUTHORITY ARE RESPONSIBLE FOR
CONTINUED EMPHASIS ON PRUDENT, SAFE AND ACCEPTED PRACTICES WHILE
UNDERWAY - REGARDLESS OF THE MISSION. AT THE LOCAL LEVEL, AFLOAT
CO'S AND OINC'S ARE DIRECTED TO PERSONALLY CONDUCT THE NECESSARY
NUMBER OF TRAINING SESSIONS WITH ALL QUALIFIED UNDERWAY OOD'S TO
THOROUGHLY DISCUSS BRIDGE PROCEDURES, LOOKOUT PROCEDURES, NAVIGATION
PROCEDURES, STANDING NIGHT ORDERS, AND SUCH OTHER MATTERS HE/SHE MAY
FEEL APPROPRIATE FOR THE PURPOSE OF TIGHTENING UP OUR BRIDGE WATCHES

WHERE NECESSARY. THE MEETINGS SHALL BE LOGGED IN THE SHIP'S LOG
WITH THE NAME OF ALL OOD'S PRESENT UNDER THE TITLE OF "COMMANDANT'S
BRIDGE TIGHTENING SESSION." SUBJECT MEETINGS SHOULD BE HELD WITHIN
THE NEXT TWO WEEKS AND, FOR IN-PORT VESSELS, PRIOR TO GOING TO SEA.

4. ADMIRAL P. A. YOST, COMMANDANT.
BT

G-N (1)...ORIG FOR COMDT COGARD WASHING (8) /13/

 RTD: 000-000/COPIES: 0008
 976046/5467/037 1 OF 2 M3 0086 037/01:45Z 060030Z FEB 90
.CSN. RXJG0136 COMDT COGARD WASHINGTON DC//G-C//
```

UNCLASSIFIED