# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 40604**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Benjamin C. YORK**
Captain (O-3), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary[1]

Decided 30 April 2025

———————————

*Military Judge*: Pilar Wennrich (arraignment); Charles G. Warren.

*Sentence*: Sentence adjudged 14 April 2023 by GCM convened at Hurlburt Field, Florida. Sentence entered by military judge on 31 May 2023: Confinement for 15 days, forfeiture of $4,000.00 pay per month for 6 months, and a reprimand.

*For Appellant*: Major Frederick J. Johnson, USAF; Philip D. Cave, Esquire.

*For Appellee*: Colonel Zachary T. Eytalis, USAF; Lieutenant Colonel J. Peter Ferrell, USAF; Lieutenant Colonel Jenny A. Liabenow, USAF; Major Regina M.B. Henenlotter, USAF; Mary Ellen Payne, Esquire.

Before RICHARDSON, MASON, and KEARLEY, *Appellate Military Judges*.

Judge KEARLEY delivered the opinion of the court, in which Senior Judge RICHARDSON and Judge MASON joined.

———————————

[1] Appellant appeals his conviction under Article 66(b)(1)(A), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 866(b)(1)(A), *Manual for Courts-Martial, United States* (2024 ed.).

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

---

KEARLEY, Judge:

A general court-martial composed of officer members found Appellant guilty, contrary to his pleas, of one charge and one specification of abusive sexual contact and one charge and one specification of assault upon a commissioned officer in violation of Articles 120 and 128, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 928.[2] Both offenses involved a single victim, WS, a fellow Air Force officer who temporarily worked with Appellant. The military judge sentenced Appellant to confinement for 15 days, forfeiture of $4,000.00 pay per month for six months, and a reprimand. The convening authority provided the language to the adjudged reprimand and took no other action on the findings or sentence.

Appellant raised the following issues on appeal: (1) whether Appellant received ineffective assistance from his trial defense counsel; (2) whether the military judge erred by instructing the members that evidence of uncharged acts of physical contact could be used for certain purposes under Mil. R. Evid. 404(b); (3) whether the evidence was legally and factually sufficient to support his conviction of abusive sexual contact; (4) whether the court-martial panel was properly constituted; (5) whether the military judge erred by instructing the members that assault consummated by a battery was a lesser-included offense of abusive sexual contact; (6) whether 18 U.S.C. § 922 is constitutional as applied to Appellant; and (7) whether the military judge abused his discretion in denying Appellant's post-trial motion for a finding of not guilty as to the specification of abusive sexual contact.[3] We also consider another issue not raised by Appellant: (8) whether Appellant was subjected to unreasonable post-trial delay in appellate review.

We have carefully considered issues (5), (6), and (7) and we find they do not require discussion or relief. *See United States v. Guinn*, 81 M.J. 195, 204 (C.A.A.F. 2021) (citing *United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987)). As to the remaining issues, we find no error that materially prejudiced Appellant's rights, and we affirm the findings and sentence.

---

[2] Unless otherwise indicated, references to the UCMJ, the Rules for Courts-Martial (R.C.M.), and the Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial, United States* (2019 ed.).

[3] This issue is raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

## I. BACKGROUND[4]

Appellant and WS both served as instructors in the Air Force Reserve Officer Training Corps (ROTC). Appellant first met WS when she inspected Appellant's ROTC detachment in her role as a detachment assessor. Appellant and WS served in different career fields; WS served in law enforcement.

Appellant and WS met again at Maxwell Air Force Base (AFB), Alabama, in June 2019, where they were both on temporary duty (TDY) for ROTC summer field training for ROTC cadets. This was Appellant's second summer at ROTC field training and he was serving as a squadron training officer, with oversight of three flights. This was WS's first summer at field training and she was a flight training officer in a different squadron. At the time, Appellant was a captain and WS was senior to Appellant.

As part of the team of training officers, Appellant and WS were required to use a group messaging application. They were part of a group text that included all training officers and cadre. At some point, Appellant began to message WS directly. Initially, they exchanged work-related text messages, but, after some time had passed, Appellant began to text WS about social opportunities. He invited her to have a drink with him at least six times. WS would either not reply or provide a reason she could not join Appellant. At one point, when Appellant asked her if she wanted a beer, WS jokingly texted she would need "a beer or three LOL" after taking her upcoming physical fitness test.

On 4 July 2019, Appellant and WS joined a group of instructors for dinner at a local pizza restaurant. After dinner, Appellant and others in the group headed to a baseball game. WS decided not to go to the baseball game and instead returned to her room. One of the instructors heading to the game asked WS if she would take her leftover dinner back to the base for her. Appellant overheard this conversation and asked WS to do the same with his leftovers. WS agreed and returned to her room with the leftover pizza which she placed in her refrigerator.

The next day, the instructors were enjoying some time off due to the Independence Day holiday weekend. Appellant was with a group of instructors holding a barbeque and drinking outside of billeting. WS asked Appellant if the barbeque was still going on, implying that she would head down and bring his pizza. Appellant indicated it was winding down and asked WS for her room number. WS gave Appellant her room number, and he texted back, "I'll be by in a sec."

---

[4] The following background is drawn primarily from WS's trial testimony, supplemented by other evidence in the record.

When Appellant arrived at her room, WS answered the door and went back into the room to retrieve his pizza from her refrigerator. Appellant entered the room and began talking to WS. WS handed Appellant his pizza and then she sat down on an ottoman next to a chair. Appellant put his pizza down, removed his shoes and sat down next to her on part of the chair and part of the ottoman, with his leg touching her leg. Appellant then swung one of his legs around her back to straddle her from behind and began massaging her shoulders. He then leaned in and kissed the back of WS's neck. WS stood up and told him, "You need to get your shoes, get your pizza and go." Appellant responded, "But do I, but do I?" He remained sitting down. WS said, "You're about to get yourself in trouble. You just need to get your pizza and go." WS testified that Appellant sat there for a little bit, and then he got up and started to pull WS towards him, grabbing at her clothes, "grabbing all over," and "tickling [her] sides." WS tried to push him away, but he just kept "tickling [her] sides and just grabbing all over."

As WS was trying to push him away from her, Appellant grabbed her buttocks with his hands and tried to pull her towards him. WS testified, "I was pushing him off of me and he grabbed—grabbed with his hands, just grabbed my butt while trying to pull me towards him." WS tried not to escalate the situation more or let their interaction become "super loud" because she had a neighbor across the hall who often had his door open and WS "did not want to mess things up" for Appellant professionally.

At some point Appellant went into WS's bathroom and turned on the shower. WS had no idea why he turned on the shower. While Appellant was in the bathroom WS texted another colleague and asked if he was in the dorms. He said he was across the base. She then texted "can't get dude out of my room." After leaving the bathroom, Appellant again approached WS and started pulling at her clothes and backed her into a corner. Appellant then tripped over the leg of the loveseat and pulled WS on top of him and continued to grab at her body to include her torso. At some point, Appellant stopped grabbing WS and he began singing a Celine Dion song, "My Heart Will Go On," from the *Titanic* movie. During this time, WS was able to send a group text to the same colleague and another colleague who lived in her dorm.

The second colleague went to WS's door in response to the text. She knocked on the door and, when WS opened it, she made an excuse that she and WS needed to go get money at the ATM before cadets would arrive the next day. Appellant said, "I guess I'm not invited," and left.

WS subsequently made two statements to OSI: one, the day after the event, and the other, nearly two years later. These statements are discussed in more detail *infra*.

## A. Ineffective Assistance of Counsel

In his brief, Appellant asserts his trial defense counsel, Ms. JS and now-Major (Maj) JF, were ineffective in investigating and seeking discovery to lay a sufficient foundation to establish evidence that would shift the burden to the Prosecution to disprove unlawful command influence (UCI). Appellant did not submit a declaration. In response to Appellant's allegations of ineffective assistance, the Government moved this court to compel declarations from trial defense counsel. This court granted the motion and ordered Ms. JS and Maj JF to provide affidavits or declarations responding to Appellant's claims. The affidavits submitted by the counsel address trial defense counsel's strategy for handling the UCI motion.

### 1. Additional Background

#### a. Pre-preferral

The day after the incident, WS made a statement to the Air Force Office of Special Investigations (OSI) where she described what happened with Appellant when he came into her room. In this statement, she said he did not grab her "parts," but "he might have just barely grazed [her] butt" with his hand.

OSI coordinated with the Chief of Military Justice at Maxwell AFB, who opined that the allegations did not satisfy the elements of an Article 120, UCMJ, offense, but likely showed a violation of Article 128, UCMJ. As a result, Appellant received administrative punishment for the incident.

The record indicates that, after receiving administrative punishment, in April 2020, Appellant filed a congressional complaint with Senator Jeanne Shaheen alleging that the OSI was biased in their conduct of the investigation and used insufficient investigative methods to conduct the investigation. The same month, the Director of Staff at Headquarters (HQ) OSI responded to the congressional inquiry, stating OSI "conducted a thorough review into the investigation" in this case and the review showed that "the investigation was conducted in an unbiased manner and in accordance with Air Force and OSI policy."

Meanwhile, WS wanted to follow up on her statement to the OSI, specifically to provide more details. WS stated at trial that she requested "multiple times . . . back in 2019" to "give additional details, and [she] was not afforded that opportunity." She stated she made several phone calls, left messages, sent emails, and even stopped by the legal office when she was at Maxwell AFB in the fall of 2019 and planned to provide additional details about where and how Appellant touched her. She spoke with an attorney at the Holm Center at Maxwell AFB who told her she would have the opportunity to provide more information and that someone would reach back out to her. According to WS, no one ever did.

In November 2020, WS made a Freedom of Information Act (FOIA) request for the report of investigation that she made to the OSI. When she read it, she did not feel it accurately summarized what she had said during the interview. She learned that her allegations against Appellant had been handled administratively and that her complaint had been investigated as an Article 128, UCMJ, offense for assault upon a commissioned officer, not as a sexual assault.

WS was not pleased with the command reaction to her original allegations.[5] WS wrote her United States Senator, The Honorable Tammy Duckworth, indicating that she did not feel her complaint was properly investigated. WS implied the investigation should have been handled not as just an assault, but as a sexual assault.

In response to WS's letter, Senator Duckworth wrote a letter to the Chief of Staff of the United States Air Force (CSAF) regarding her concerns about Captain York's behavior and the investigation, which included the following:

> Given these allegations, I'm questioning whether the Legal Office at the Holm's [sic] Center AFOSI Leadership at Maxwell Air Force Base are taking on measures to ensure the crimes that could fall under Article 120 are being appropriately investigated and tracked. . . .

> To ensure that there isn't a larger failure of the systems in place to investigate and prosecute crimes under Article 120 of the UCMJ, and care for survivors who report sexual assault, I request that your staff review any complaints related to the handling of reports of sexual assault lodged against the Holm's [sic] Center Legal Office, AFOSI, other legal centers and unit commanders on Maxwell Air Force Base, and verify that appropriate measures are being taken to track sexual assault cases and keep victims appropriately informed throughout the investigatory process.

> I would appreciate you looking into this matter at your earliest convenience. Please advise [RC] in my Belleville office of your findings.

At some point after that letter was sent to the CSAF, OSI reopened its investigation. WS was re-interviewed and provided a more detailed statement to OSI in 2021, nearly two years after the incident. In this interview, WS told the investigators Appellant "definitely touched [her] breasts while pulling on [her] clothes," and "he absolutely touched [her] butt" and "touched all over . . . mostly

---

[5] WS said she did not know the actual disposition until two days prior to the trial.

through grabbing." Ultimately, court-martial charges for the offenses were preferred against Appellant.

### b. Post-preferral

Trial defense counsel filed four discovery requests related to UCI, including requests for "any and all statements, memoranda for records, emails and papers to or from HQ AFROTC and AFROTC Northeast Region relating to Appellant, WS, or allegations substantive in this case." The Government provided timely responses to all four discovery requests for any such communications. During the several months leading to trial, the Government had informed trial defense counsel that the Defense possessed all responsive records in possession of the Government. The record of trial does not contain any documentation of communication from the CSAF relating to Senator Duckworth's letter to any Air Force entity such as the Office of the Inspector General of the United States Department of the Air Force, the OSI Detachment at Maxwell AFB, and the Holm Center for Officer Accessions & Citizen Development at Maxwell AFB.

Trial defense counsel filed a motion to dismiss for UCI. Appellant's trial defense counsel specifically referenced not having any communication between the CSAF and OSI. The defense position was that Senator Duckworth is capable of exerting UCI and that the CSAF exerted UCI in requesting a reopening of the investigation.[6] Trial defense counsel specifically stated there was a "reasonable inference" that the CSAF directed reopening the investigation and that was enough to shift the burden to the Government to show that UCI did not take place. Trial defense counsel argued, "[I]t is a 'but for' argument. It's a but for the reopening, there never would have been the preferral or this determination."

After hearing argument by both parties regarding the UCI, the military judge initially indicated he was "going to make a finding that the [D]efense has made some showing of UCI to shift the burden to the [G]overnment."

> So, I do find the [G]overnment is going to have to demonstrate beyond a reasonable doubt either that the facts as alleged do not constitute UCI or that they don't place an intolerable strain on the [G]overnment in order to satisfy its burden under the apparent UCI [standard]. I think I would analogize the situation in *Gerlich*[7] to this in terms of reasonable inference that the [CSAF] directed the reopening of the investigation. OSI was not going to do it themselves. They had already relooked at this after

---

[6] The record did not contain any documentation of a request from the CSAF to OSI to reopen the investigation.

[7] *United States v. Gerlich*, 45 M.J. 309 (C.A.A.F. 1996).

> being asked by [Appellant] to look at it. And they said, Nothing to see here.

The military judge went on to explain his position and trial counsel provided additional argument. The military judge let the parties know he would use the lunch recess to deliberate.

After recessing, the military judge came back with a final decision stating, "[A]fter carefully reviewing the parties['] pleadings on the subject . . . , the court is going to respectfully deny the Defense's Motion to Dismiss for Unlawful Command Influence."

The military judge later provided a 23-page written ruling on the Defense Motion to Dismiss for UCI. The military judge concluded that there was no evidence that Senator Duckworth is a person subject to the Uniform Code of Military Justice given her current status as a civilian United States Senator.[8] He further found:

> [T]his request from Senator Duckworth was not a prejudgment of guilt; neither was it a recommendation for a particular case deposition; nor was [it] a recommendation of a particular punishment for [Appellant] in the event of a conviction; nor was it an expressed or implied threat to take adverse career action against [the CSAF] in the event he declined to "review any complaints related to the handling of reports of sexual assault" as set forth in Sen[ator] Duckworth's letter.

The military judge went on to state:

> [OSI Headquarters] did re-initiate investigation in this case on or about 19 July 2021 after the Congressional Inquiry by Senator Duckworth. There is no evidence that [the] CSAF personally ordered it, but a fair inference from the facts is that the investigation was initiated from superior authority outside OSI channels.

> Assuming arguendo that [the] CSAF took direct or indirect action to direct or request AFOSI to re-initiate an investigation in the summer of 2021, [the] CSAF made no case disposition recommendations in any request from re-investigation.

The military judge determined that Appellant presented "no evidence that any officer preferring or referring charges did so under the specter of expectation from [the] CSAF or any other authority outside [the General Court-

---

[8] The military judge took judicial notice of her status as an Army National Guard retiree.

Martial Convening Authority's] chain of command." The military judge also pointed out that "[r]equests by the CSAF to initiate an investigation or to re-initiate an investigation are not in violation of existing DoD or AF regulations."

Appellant claims his trial defense counsel were ineffective by not doing more to investigate and seek discovery related to UCI. In response to this court's order, Appellant's civilian defense counsel, Ms. JS, and military defense counsel, Maj JF, submitted declarations about their discovery efforts. This court attached these declarations to the record of trial. The record now contains at least some of the defense discovery requests and the Government's responses.

Ms. JS indicated that because the Government responded to all four discovery requests with either new evidence or an explanation that no other evidence existed, trial defense counsel had no reason to file a motion to compel discovery.

Appellant's trial defense counsel claim they engaged in extensive efforts to obtain documentation related to the communications between Senator Duckworth and the CSAF, as well as all internal OSI correspondence. However, they were told everything had been turned over. Maj JF specifically stated,

> [T]he [d]efense team submitted a supplemental discovery request seeking any further documentation or evidence related to [WS's] congressional inquiry, IG complaint, and [Appellant's] prior OSI investigation as Cadet York. I can also personally state that I had numerous good faith conversations with both [P]rosecutors on this case, requesting all relevant discovery, correspondence, and materials regarding the named victim's initial congressional inquiry and I never doubted the Government's truthfulness when they indicated that everything had been turned over. The Senior Trial Counsel and Assistant Trial Counsel repeatedly assured the [d]efense team that no further correspondence existed beyond what the Government had already disclosed.

In her declaration, Ms. JS described her defense motion to dismiss for UCI and how she argued that they did not have any communication from the CSAF and OSI that led to reopening the investigation. She went on to explain her reasoning for not pursuing an interview of the CSAF and further investigating and seeking of discovery related to Appellant's claim of UCI. First, she felt the Government had engaged in substantial effort to exhaust potential avenues to uncover responsive materials. Second, Ms. JS believed securing additional evidence and asking for reconsideration of the UCI motion would be a "losing battle" and she did not foresee a different result because the communication

from Senator Duckworth was not directive of any particular outcome and the military judge had already determined that she was incapable of committing UCI because she was not in the military or subject to the UCMJ. Third, she reminded Appellant that he had filed his own inquiry and both he and WS had not felt the 2019 investigation was properly conducted.

Ms. JS explained that Appellant keyed in on her remarks during the motion hearing that they did not have any communication from the CSAF in their discovery efforts. Ms. JS told Appellant that she did not believe she would be granted an opportunity to interview the CSAF, but even if she did, she did not think those efforts would lead to the CSAF admitting to directing any member of the chain of command to prefer charges (actual UCI) or any similar inclination that could produce any better inference of UCI (apparent UCI). Ms. JS explained how efforts to interview the CSAF would "likely delay the trial" and she saw the toll the reinvestigation already had on Appellant. Based on her professional interactions with Appellant over the years, she knew prolonging this issue was having a negative effect on Appellant's well-being.

Ms. JS detailed her discussions with Appellant where she described to him that, in light of the "very low potential for any meaningful relief to come from additional efforts to investigate or litigate the UCI issue," she felt their "time was better served to prepare for trial." She stated that Appellant concurred with her strategy to look forward to trial preparation. Maj JF also described how Appellant "agreed with all trial defense strategies that we made to provide him with the best opportunity for success in findings."

### 2. Law

#### *a. Ineffective Assistance of Counsel*

The Sixth Amendment[9] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). In assessing the effectiveness of counsel, we apply the standard set out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence as stated in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citation omitted). Claims of ineffective trial defense counsel are reviewed de novo. *United States v. Palacios Cueto*, 82 M.J. 323, 327 (C.A.A.F. 2022) (citation omitted).

We utilize the following three-part test to determine whether the presumption of competence has been overcome:

---

[9] U.S. CONST. amend. VI.

1. Are the appellant's allegations true, and if so, "is there a reasonable explanation for counsel's actions"?

2. If the allegations are true, did trial defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?

3. If trial defense counsel were deficient, is there "a reasonable probability that, absent the errors," there would have been a different result?

*United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (alteration and omission in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)).

The burden is on the appellant to demonstrate both deficient performance and prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted). To overcome the presumption of competence, appellant must show there were "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

"[C]ourts 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Datavs*, 71 M.J. at 424 (quoting *Strickland*, 466 U.S. at 689) (additional citation omitted). We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009) (citation omitted). When evaluating for prejudice, a "reasonable probability" of a different result is "a probability sufficient to undermine [our] confidence in the outcome" of the trial. *Datavs*, 71 M.J. at 424 (quoting *Strickland*, 466 U.S. at 694) (additional citation omitted).

[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

*United States v. Scott*, 81 M.J. 79, 85 (C.A.A.F. 2021) (alteration in original) (quoting *Strickland*, 466 U.S. at 697) (additional citation omitted).

### b. Unlawful Command Influence

We review allegations of UCI de novo. *United States v. Proctor*, 81 M.J. 250, 255 (C.A.A.F. 2021) (citations omitted). A claim of unlawful influence from a non-command source is evaluated by the same standard used to evaluate

"those acting with the mantle of command authority." *United States v. Barry*, 78 M.J. 70, 76–77 (C.A.A.F. 2018).

Article 37(a)(3), UCMJ, 10 U.S.C. § 837(a)(3),[10] states:

> No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority or preliminary hearing officer with respect to such acts taken pursuant to this chapter as prescribed by the President.

Additionally, Article 37(c), UCMJ, 10 U.S.C. § 837(c), states, "No finding or sentence of a court-martial may be held incorrect on the ground of a violation of this section unless the violation materially prejudices the substantial rights of the accused."

The test for actual unlawful command influence requires an appellant to demonstrate (1) "facts, which if true, constitute unlawful command influence;" (2) "the court-martial proceedings were unfair to the [appellant];" and (3) "the unlawful command influence was the cause of that unfairness." *United States v. Boyce*, 76 M.J. 242, 248 (C.A.A.F. 2017) (citation omitted). To determine if apparent unlawful command influence was present, an appellant must bring forward "some evidence" to suggest that: (a) the facts, if true, "constitute unlawful command influence," and (b) "this unlawful command influence placed an 'intolerable strain' on the public's perception of the military justice system because 'an objective, disinterested observer, fully informed of all the facts and circumstances, would harbor a significant doubt about the fairness of the proceeding.'" *Id.* at 249 (citation omitted). "If [an appellant] presents some evidence of unlawful command influence, the burden shifts to the [G]overnment to prove beyond a reasonable doubt that either (a) the predicate facts proffered by the appellant do not exist, or (b) the facts as presented do not constitute unlawful command influence." *Proctor*, 81 M.J. at 256 (quotation marks and citation omitted). "The threshold for raising the issue at trial is low, but more

---

[10] All references in this opinion to Article 37, UCMJ, are from the National Defense Authorization Act for Fiscal Year 2020 (FY20 NDAA), Pub. L. No. 116-92, § 532, 133 Stat. 1198, 1359–61 (20 Dec. 2019). FY20 NDAA made changes to Article 37, UCMJ, which took effect on 20 December 2019 and apply to violations of Article 37, UCMJ, committed on or after that date. In this case, as the alleged violations of UCI under Article 37, UCMJ, first occurred in calendar year 2021 when Senator Duckworth sent her letter to the CSAF. Thus, the new version of Article 37, UCMJ, is applicable to this case.

than mere allegation or speculation." *United States v. Biagase*, 50 M.J. 143, 150 (C.A.A.F. 1999) (citation omitted).

### 3. Analysis

As a preliminary matter, Appellant requested a *DuBay*[11] hearing. We have considered this request and do not find a *DuBay* hearing is required. *Cf. United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997) (announcing principles to consider before ordering a fact-finding hearing when the appellant submits an affidavit in support of an IAC claim on appeal); *see also* Article 66(f)(3), 10 U.S.C. § 866(f)(3) (providing authority for Courts of Criminal Appeals (CCA) to "order a hearing as may be necessary to address a substantial issue"). Appellant submitted no declaration, there is no conflict between the two trial defense counsel declarations, and there is no factual matter that needs to be resolved to make our determination, including whether a pertinent communication from the CSAF exists.

We have carefully considered Appellant's allegations of ineffective assistance of counsel, and we conclude he has not demonstrated he is entitled to relief. We follow the United States Supreme Court's guidance, as recognized by our immediate superior court, the United States Court of Appeals for the Armed Forces (CAAF), "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Scott*, 81 M.J. at 85 (quoting *Strickland*, 466 U.S. at 697) (additional citation omitted). That is, we decide this case based on the third part of the test in *Gooch*: "[I]s there 'a reasonable probability that, absent the errors,' there would have been a different result?" 69 M.J. at 362 (citation omitted); s*ee also Datavs*, 71 M.J. at 424 (citation omitted) (stating that in claims of IAC, the burden is on the appellant to demonstrate prejudice). We answer this question in the negative.

Even if trial defense counsel was deficient in that they failed to make a more specific written discovery request and interview additional witnesses, Appellant has failed to show that there is a reasonable probability that, absent the error, there would have been a different result. The only evidence of impact of Senator Duckworth's memo we have is that it likely led to a second investigation. We note that even if the CSAF had directed a reopening of the investigation, that, in and of itself, is not necessarily UCI. Reopening an investigation is not directing a convening authority to take a specific action against an accused. *See Boyce*, 76 M.J. at 248 (citation omitted).

Appellant may claim that "but for" the second investigation, he would not have been convicted; however, the investigation alone is not prejudicial to

---

[11] *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967) (per curiam).

Appellant. Simply reopening an investigation would not cause an observer to believe the court-martial proceeding was unfair to Appellant, especially when the Appellant himself complained about the bias and insufficient investigative methods in the first investigation. As such, a new investigation would not prejudice Appellant by undermining confidence in the outcome. *See also Datavs*, 71 M.J. at 424 (quoting *Strickland*, 466 U.S. at 694) (additional citation omitted) (when evaluating for prejudice, a "reasonable probability" of a different result is "a probability sufficient to undermine [our] confidence in the outcome" of the trial). A new investigation in this circumstance, where both parties criticized the original one, could actually strengthen confidence in the outcome, vice undermining it.

Therefore, even if the CSAF's office had somehow encouraged directly or indirectly that the investigation be reopened, and counsel was deficient in not uncovering this, such information likely would not have been UCI, nor would it have led to a different result under the circumstances. *See Gooch*, 69 M.J. at 362. Thus, even presuming that we found trial defense counsel's performance fell below the standard expected of fallible lawyers, Appellant has not met his burden to demonstrate prejudice and is, therefore, not entitled to relief.

## B. Military Judge's Instruction – Uncharged Misconduct Under Mil. R. Evid. 404(b)[12]

Appellant claims that the military judge erred by instructing the members that certain evidence, specifically Appellant's acts of kissing WS's neck and rubbing her shoulders, could be considered under Mil. R. Evid. 404(b) for the purpose of demonstrating (1) lack of mistake of fact on the part of the accused and (2) Appellant's desire for WS and intent to gratify his sexual desire in touching her with or without her consent.

### 1. Additional Background

Prior to trial, Appellant's trial defense counsel submitted a "Defense Motion for Appropriate Relief Admit [Mil. R. Evid.] 412 Evidence," requesting to admit evidence that Appellant sat behind WS and massaged her shoulders and that WS did not resist. Appellant also wanted to admit evidence that he leaned forward to kiss WS on her neck while he massaged her shoulders. The Government did not object to this evidence and considered it *res gestae* of the offense. WS, through her counsel, objected to the consensual nature of the massage. In a closed hearing the military judge tried to clarify how the Government would

---

[12] Appellant does not claim the military judge erred by allowing uncharged misconduct into evidence under Mil. R. Evid. 404(b).

use the evidence. The Government again reiterated it was "*res gestae*, facts and circumstances."

The military judge determined that the court would provide a limiting instruction to the members as to how they can use the evidence. Before the opening statements, the military judge held a hearing with the counsel. He informed them he intended to give a limiting instruction for the Mil. R. Evid. 412 evidence that would include an instruction relating to Mil. R. Evid. 404(b), specifically, the uncharged conduct of Appellant rubbing WS's shoulders and kissing her neck. The military judge read the proposed instruction:

> Members, you've heard testimony concerning that the accused may have rubbed the shoulders of [WS], and also kissed her neck. Neither of those instances are charged misconduct in this case, and so I advise you that that testimony was admitted for a limited purpose. Namely, the parties intend to offer counter arguments as to the implications of these actions. The [D]efense intends to argue that[,] if true, it may create a reasonable mistake of fact in the mind of the accused that [WS] may have been consenting to the charged misconduct. The [G]overnment intends to argue in contrast that those actions simply demonstrate the accused's sexual desire of [WS], and his intent to gratify his sexual desire in touching her with or without her consent. You may consider the evidence solely for its tendency, if any, to inform those bases I've just identified. You may not consider it for any other purpose. Specifically, you may not infer from the evidence that [WS] is a bad person with bad character or has the propensity to engage in sexual acts generally. Rather, you may consider it only for the limited purpose identified above. By the same token, you may not infer from this evidence that the accused is a bad person with bad character with general criminal propensity. Rather, you may consider it for the limited purpose identified above.

> In deciding the weight, if any, to give to this evidence, you may consider the totality of the circumstances surrounding this incident. Ultimately, the weight, if any, you give to these actions is solely within your discretion.

The military judge asked if there were any objections to that limiting instruction, and trial counsel said, "[N]o, sir" and trial defense counsel said, "[N]one, sir."

However, later in the trial after the Defense rested, while discussing instructions for the members, trial defense counsel objected to the military

judge's proposed Mil. R. Evid. 404(b) instruction, which told the members they could consider evidence of massaging and kissing as evidence of intent to gratify sexual desire. Trial defense counsel pointed out there was no notice by the Government of their intent to use Mil. R. Evid. 404(b) evidence.[13] The Government's position was that the testimony was *res gestae*, and not Mil. R. Evid. 404(b) evidence, stating, "It's not uncharged misconduct. It is specific evidence for an element of the crime." The military judge "out of an abundance of caution" disagreed that the testimony was *res gestae*. The military judge specifically asked trial defense counsel during the closed hearing if they had "any objections" to the Government using evidence of Appellant's massaging of WS's shoulders and kissing of her neck "to suggest the accused intended to gratify his own sexual desire." Civilian defense counsel replied, "[N]one, sir." The military judge noted that he conducted a Mil. R. Evid. 404(b) analysis and concluded he would provide a Mil. R. Evid. 404(b) instruction.

The instruction read:[14]

> You heard testimony that the [a]ccused may have sat behind and rubbed the shoulders of [WS] and also kissed her neck, or attempted to kiss her neck, in the moments shortly preceding the charged misconduct. That is the buttocks grabbing and the torso grabbing. Neither of those instances, that is the kiss – alleged kiss on the neck or shoulders rubbing are themselves the charged misconduct in this case, and so I advise you that that testimony was admitted for a limited purpose, namely the parties intend to offer counter arguments as to the implications of these actions.

> The defense intends to argue that it if true, this may have created a "reasonable mistake of fact" in the mind of the [a]ccused that [WS] may have been consenting to the charged misconduct. The [G]overnment intends to argue in contrast that those actions tend to demonstrate the [a]ccused's sexual desire of [WS] and his intent to gratify his sexual desire in touching her with or without her consent. You may consider the evidence solely for

---

[13] Anticipating the Defense would claim a lack of notice, the military judge stated he would question them as to how they could be unprepared to address this issue. He pointed out that this information was provided to them months earlier in discovery and discussed on the first day of trial.

[14] The instruction was titled, "Limited Use Evidence, Uncharged Physical Contact between the Accused and [WS]."

its tendency, if any, to inform those two bases which I just mentioned. You *cannot* consider it for any other purpose.

Specifically, you may *not* infer from this evidence that [WS] is a bad person with bad character or has any propensity to engage in sexual acts generally. Rather, you may consider it only for the limited purpose of whether her responses to the [a]ccused's actions in her room on the night of 5 July 2019 created any "reasonable mistake of fact as to consent" in the mind of the [a]ccused.

By the same token, you may *not* infer from this evidence that the [a]ccused is a bad person with bad character or has any general criminal propensity in sexual acts generally. Rather, you may consider it only for the limited purpose of its tendency if any, to demonstrate that Accused's motive and intent to gratify his sexual desire pertinent to Charge I.

In deciding the weight, if any, to give to this evidence, you may consider the totality of the circumstances of these events. Ultimately, the weight, if any, you give to this evidence is solely in your own discretion.

(Emphasis added).

Appellant claims that the military judge's "sua sponte resolution was an abuse of discretion" and that the Defense detrimentally relied on the Government's lack of Mil. R. Evid. 404(b) notice and therefore, when the acts came in under Mil. R. Evid. 404(b) it was too late for the Defense to plan their case presentation, litigate the admissibility of evidence, and prepare a more thorough response to the instruction.

### 2. Law

A preserved claim of instructional error is a question of law reviewed de novo. *United States v. Payne*, 73 M.J. 19, 22 (C.A.A.F. 2014). A military judge's decision to provide an instruction is reviewed for abuse of discretion. *United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002): *United States v. Anderson*, 51 M.J. 145, 153 (C.A.A.F. 1999).

The military judge "has substantial discretionary power in deciding on the instructions to give." *United States v. Smith*, 50 M.J. 451, 455 (C.A.A.F. 1999) (quoting *United States v. Damatta-Olivera*, 37 M.J. 474, 478 (C.M.A. 1993)). Where an instruction is not requested by a party, the military judge may have a *sua sponte* duty to give it if the issue is reasonably raised by some evidence. *Id.* (citations omitted). Required instructions include "explanations, descriptions, or directions as may be necessary and which are properly requested by

a party or which the military judge determines, *sua sponte*, should be given." R.C.M. 920(e)(7). The subject of instruction in appropriate cases includes the limited purpose for which evidence was admitted and the effect of character evidence. *Id.,* Discussion.

Mil. R. Evid. 404(b)(1) prohibits the use of evidence of a crime, wrong, or other act by a person as evidence of the person's character to show this person acted in conformity with that character on a particular occasion. However, pursuant to Mil. R. Evid. 404(b)(2), such evidence may be admissible for another purpose, including, motive, plan, intent, or the absence of mistake. At the request of the accused, the prosecution must "provide reasonable notice of the general nature of any such evidence that the prosecution intends to offer at trial;" and "do so before trial; or during trial if the military judge, for good cause, excuses lack of pre-trial notice." Mil. R. Evid. 404(b)(2)(A), (B).

**3. Analysis**

The military judge did not abuse his discretion in providing a *sua sponte* instruction on how the evidence involving shoulder rubbing and kisses to WS's neck could be used. Military judges have "substantial discretionary power" in deciding which instructions to give. *Smith*, 50 M.J. at 455.

Evidence of Appellant's and WS's physical contact before the charged misconduct was raised during trial when WS testified about what happened once Appellant showed up at her room. Both before trial and during trial, trial defense counsel did not object to this evidence. To ensure that the members did not use this evidence for character or propensity purposes, the military judge used his *sua sponte* authority to give an instruction because the evidence was raised and he knew both sides intended to argue the evidence for different reasons. The instruction equally addressed both Appellant and WS and told the members not to use the information to determine that Appellant or WS were bad persons with bad character. He equally instructed them not to infer that WS had the propensity to engage in sexual acts generally and not to infer that Appellant had any criminal propensity in sexual acts generally. The military judge articulated how both sides intended to use the evidence to support their view of the case. As such, the military judge did not abuse his discretion by applying his substantial discretionary power to instruct the members how they can consider the evidence of physical contact.

Next, we turn to Appellant's argument that the Government failed to provide notice of the Mil. R. Evid. 404(b) evidence when "its argument that the information was res gestae was insufficient." The evidence at issue was contained in WS's OSI interviews and used in cross-examination of WS during her testimony. Trial defense counsel indicated they intended to argue the same evidence in support of their mistake of fact defense as to consent. The military

18

judge granted them the ability to "argue it for the inferences desired." Significantly, trial defense counsel indicated to the military judge that they had no objections to the Government using evidence of Appellant's massaging of WS's shoulders and kissing of her neck to prove intent to gratify Appellant's sexual desire. Therefore, even if the Government violated the notice requirement contained in Mil. R. Evid. 404(b), Appellant was not prejudiced. Trial defense counsel did not argue they needed more time to prepare and in fact planned to, and did, use that evidence to support their theory of the case.

Given the discretionary power given to military judges with regards to instructions, combined with the particular care this military judge showed in crafting the instruction and ensuring that both parties could argue the evidence in the manner they intended, the military judge did not abuse his discretion in providing the instruction.

## C. Legal and Factual Sufficiency

In his appeal, Appellant challenges the legal and factual sufficiency of abusive sexual contact in violation of Article 120, UCMJ. Appellant asserts the Government failed to prove the specific intent element of the charged offense—that Appellant touched WS's buttocks with intent to gratify his sexual desire.

### 1. Additional Background

WS testified at trial that after Appellant sat down next to her, he stood up and swung his leg all the way around the back of her body, sitting behind her on the ottoman, straddling her with one leg on either side of her. Appellant then gave her a massage and kissed the back of her neck. WS stood up and told Appellant to leave, and then Appellant began to grab her all over and pull her toward him, tickling her sides, while she tried to push him away. WS testified that Appellant then "grabbed [her] butt while trying to pull [her] towards him."

On cross-examination, WS acknowledged that her initial statement to OSI indicated Appellant "tried" to kiss her neck, although she did not know why the word "try" was in there. She also admitted that she and Appellant had previously discussed topics that included problems with showers in the billeting and finding a place to get massages. Additionally, WS told OSI she did not want to report the incident but felt she should because Appellant was around female ROTC cadets.

During the cross-examination, civilian trial defense counsel, Ms. JS, asked about the inconsistencies between the two statements WS made to OSI, the first in 2019, the day after the incident, and the second in 2021. WS agreed that in 2019, she talked about the touching of her buttocks as "grazing," while in 2021, she used the word "grabbing." She also agreed that in 2019, she did not say Appellant touched her breasts, but in 2021, she said he did. She

admitted during cross-examination that in 2021 she was not sure if his touching of her breasts was done on purpose.

WS explained that in 2019, when she made her initial report, she was "embarrassed" and said her thought at the time was, "I'm like, I'm [a law enforcement professional]. I'm [senior to him]. Like this should not be happening." She also said,

> [Appellant] and I in that room were talking about all the things that he was—his career aspirations, opportunities that he was just about to have, and he was doing very well. And that weighed very heavily on me. It still weighs heavily on me. I didn't—my goal was not to ruin his life. And that's what I kept thinking about, he's making a decision, a bad decision while he was intoxicated, do I need to—how far do I need to press this issue. That's what I was thinking about.

On cross-examination, WS maintained her assertion that in the summer of 2019, when she first spoke to OSI, she was deeply conflicted over the consequences that her decision to report might bring about for Appellant:

> [Civilian Defense Counsel (CDC)]: You're telling us that in July of 2019, when you gave your statement, that you willfully gave them false information?
>
> [WS]: I left out details.
>
> [CDC]: But it wasn't just leaving it out, [WS], they asked you specifically about where you were touched, right?
>
> [WS]: I'm sure they did. And I did not, and still to this day my intent is not to ruin [Appellant]'s life. It is—I'm—that's not my goal here.

WS testified that after her first statement to OSI, she requested an opportunity in that same year to provide additional information to OSI about the touching but was not given an opportunity to do so. WS stated at trial that she asked "multiple times . . . back in 2019" to "give additional details, and [she] was not afforded that opportunity." She stated that she made several phone calls, left messages, sent emails, and even stopped by the legal office when she was TDY in the fall of 2019 and she spoke with an "attorney at that time" and was told she would have the opportunity to provide more information and that the legal office would reach back out to her, but she claimed they never did.

**2. Law**

### *a. Legal and Factual Sufficiency*

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). "Our assessment of legal and factual sufficiency is limited to the evidence produced at trial." *United States v. Rodela*, 82 M.J. 521, 525 (A.F. Ct. Crim. App. 2021) (citation omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (citation omitted). "[T]he term 'reasonable doubt' does not mean that the evidence must be free from any conflict . . . ." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (citation omitted). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). Thus, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *King*, 78 M.J. at 221 (alteration in original) (citation omitted). "This deferential standard impinges upon the factfinder's discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *United States v. Mendoza*, __ M.J.__, No. 23-0210, 2024 CAAF LEXIS 590, at *9 (C.A.A.F. 7 Oct. 2024) (internal quotation marks and citation omitted). "The [G]overnment is free to meet its burden of proof with circumstantial evidence." *King*, 78 M.J. at 221 (citations omitted).

"The test for factual sufficiency is 'whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *Rodela*, 82 M.J. at 525 (second alteration in original) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018).

### *b. Abusive Sexual Contact*

To convict Appellant of abusive sexual contact without consent, the Government was required to prove the following two elements beyond a reasonable doubt: (1) that Appellant committed sexual contact upon WS, and (2) that

Appellant did so without WS's consent. *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), pt. IV, ¶ 60.b.(4)(d).

"Sexual contact" includes "touching or causing another person to touch, either directly or through the clothing, the . . . buttocks of any person, with an intent to . . . gratify the sexual desire of any person." *MCM*, pt. IV, ¶ 60.a.(g)(2).

"'[C]onsent' means a freely given agreement to the conduct at issue by a competent person. An expression of lack of consent through words or conduct means there is no consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(A). "All the surrounding circumstances are to be considered in determining whether a person gave consent." *MCM*, pt. IV, ¶ 60.a.(g)(7)(C).

"[I]t is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense." Rule for Courts-Martial (R.C.M.) 916(j)(1). If the mistake goes to an element requiring general intent, it "must have existed in the mind of the accused and must have been reasonable under all the circumstances." *Id.* "Therefore, an honest and reasonable mistake that the victim consented to the charged sexual contact is an affirmative defense to abusive sexual contact as it is to other sexual offenses." *Rodela*, 82 M.J. at 526 (citations omitted). "Once raised, the Government bears the burden to prove beyond a reasonable doubt that the defense does not exist." *Id.* (citing R.C.M. 916(b)(1)) (additional citation omitted).

### 3. Analysis

Appellant asks this court to find his conviction for abusive sexual contact in violation of Article 120, UCMJ, to be legally and factually insufficient because of WS's inconsistent statements and the Government's lack of proof of his intent. After carefully reviewing the record, we find the Government introduced sufficient evidence for a rational trier of fact to find Appellant guilty of abusive sexual contact beyond a reasonable doubt, and we ourselves are so convinced.

#### a. Credibility of WS

Appellant claims that the inconsistencies between WS's statements to OSI shortly after the incident and her testimony at trial "should lead a reasonable factfinder to doubt the veracity of [WS]'s testimony that [Appellant] 'grabbed' her buttocks, and it is harder to infer intent to gratify sexual desire from other, potentially less deliberate forms of touching." However, after reviewing the unique facts of this case, we conclude that Appellant "touched" WS's buttocks as charged.

WS was able to explain the inconsistencies at trial. First, she explained that in 2019, during her first statement to OSI, she was "minimizing" Appellant's conduct, as Appellant's career aspirations "weighed heavily" on her. During the trial, she explained multiple times that she did not want to ruin Appellant's life or career. This line of reasoning is consistent with her decision in the moment of the incident to not get "super loud," as he attempted to grab and tickle her, in an effort to prevent alerting her neighbor to Appellant's behavior so he would not get in trouble. Second, WS was embarrassed to report the full extent of Appellant's actions. She was older than Appellant, senior to Appellant, and she was a law enforcement professional reporting her own assault to a law enforcement agency.

Additionally, and compelling to this court, is WS's testimony that after leaving field training, she returned to Maxwell AFB later that same year and sought out the legal office to add more information to her initial report. This took place prior to her request to see a copy of her report of investigation. Thus, we find the argument that WS was motivated by a desire to get a different outcome to the investigation unpersuasive. It seems she wanted to supplement her initial report while the investigation was ongoing and since she was told she would have that opportunity, she waited . . . and waited . . . before deciding to file a FOIA request to find out what happened.[15]

In summary, although during trial WS testified to different facts than she initially laid out in her 2019 report to the OSI, a rational factfinder could find that WS's explanation for why she understated Appellant's behavior in her initial report to be reasonable. Moreover, the discrepancies alone do not cause us to find Appellant's conviction of abusive sexual contact to be factually insufficient.

### b. Requisite Specific Intent

Appellant claims the Government attempted to meet its burden of establishing the required specific intent by arguing that Appellant's earlier attempt to kiss WS's neck showed intent to gratify his sexual desire. Appellant points out that kissing WS's neck is not the act the Government charged and goes on to argue that the kiss was not simultaneous with Appellant reportedly touching her buttocks. Thus, according to Appellant, the overall intent throughout a situation cannot be imputed to every discrete action within that situation.

Given the facts and circumstances of this case, we are not persuaded by Appellant's argument. A reasonable person could find the acts of kissing WS's neck and massaging her shoulders while straddling her from behind—in

---

[15] We note that the COVID-19 pandemic was ongoing during the time the investigation was ongoing.

combination with the other evidence adduced at trial such as the massage, the grabbing, and the tickling and touching of her sides—sufficiently support a finding that Appellant subsequently touched WS's buttocks with the intent to gratify his sexual desire. In short, circumstantial evidence supports the element that Appellant had the requisite intent for abusive sexual contact in violation of Article 120, UCMJ, beyond a reasonable doubt.

Accordingly, we find Appellant's conviction for abusive sexual contact legally sufficient. Furthermore, having weighed the evidence in the record of trial, and having made allowances that we did not personally observe the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt.

## D. Court Member Selection

### 1. Additional Background

Before convening Appellant's court-martial, the convening authority was provided with the names of 24 potential court-martial members. Of those 24, one clearly and two possibly had names that suggested they were female. The convening authority detailed 16 of the 24 personnel to serve as members on Appellant's court-martial. Included among the 16 members were all three members whose names suggested they may be female. The other 13 members had traditionally male names. In selecting the members to serve on the panel, the convening authority's memorandum states, "[B]y reason of their age, education, training, experience, length of service, and judicial temperament under Article 25, UCMJ, [10 U.S.C. § 825,] I detail the following individuals to serve as members in [Appellant's court-martial]."

Prior to the court-martial, a new convening authority relieved three members. One of the three members relieved was a member with a name that could have been a female name and the other two excusals had traditionally male names. The convening authority detailed three new replacement members to the panel. All three replacement members had traditionally male names.

Following voir dire at trial, trial counsel and trial defense counsel mutually agreed to challenge six potential members for cause, including the two remaining panel members with female names.[16] Both members were subsequently excused, and the panel was comprised entirely of members with traditionally male names.

The Defense did not object to the convening authority's court member selection process prior to his appeal before this court.

---

[16] From our review of voir dire and challenges, both members appear to have been female.

**2. Law**

Court-martial composition issues not raised at trial are forfeited and reviewed on appeal for plain error. *United States v. King*, 83 M.J. 115, 120–21 (C.A.A.F. 2023), *cert. denied*, 144 S. Ct. 190 (2023). Under the plain error standard of review, the "[a]ppellant bears the burden of establishing: (1) there is error; (2) the error is clear or obvious; and (3) the error materially prejudiced a substantial right." *Robinson*, 77 M.J. at 299 (citation omitted). In undertaking a plain error analysis, we "consider whether the error is obvious at the time of appeal, not whether it was obvious at the time of the court-martial." *United States v. Harcrow*, 66 M.J. 154, 159 (C.A.A.F. 2008).

"When convening a court-martial, the convening authority shall detail as members thereof such members of the armed forces as, in his opinion, are best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament." Article 25(e)(2), UCMJ, 10 U.S.C. § 825(e)(2).

In *United States v. Crawford*, the United States Court of Military Appeals held the intentional selection of African American servicemembers to serve on courts-martial in order to ensure fair representation of the community was consistent with constitutional guarantees of equal protection. 35 C.M.R. 3, 13 (C.M.A. 1964); *see also United States v. Smith*, 27 M.J. 242, 249 (C.M.A. 1988) ("[A] commander is free to require representativeness in his court-martial panels and to insist that no important segment of the military community—such as blacks, Hispanics, or women—be excluded from service on court-martial panels.").

In *Batson v. Kentucky*, the United States Supreme Court held a criminal defendant "ha[s] the right to be tried by a jury whose members are selected pursuant to non-discriminatory criteria," and in particular "the Equal Protection Clause[17] forbids the prosecutor to challenge potential jurors solely on account of their race" through the exercise of peremptory challenges. 476 U.S. 79, 85–86, 89 (1986).

In *United States v. Jeter*, the CAAF overruled *Crawford* in light of *Batson*, holding "[i]t is impermissible to exclude or intentionally include prospective members based on their race." 84 M.J. 68, 73 (C.A.A.F. 2023). The CAAF explained, "whenever an accused makes a prima facie showing that race played a role in the panel selection process at his court-martial, a presumption will arise that the panel was not properly constituted," which the Government may then attempt to rebut. *Id*. at 70. In *Jeter*, "trial defense counsel challenged the makeup of the panel, citing a 'systematic exclusion of members based on race

---

[17] U.S. CONST. amend. XIV.

and gender.' The military judge noted that '[i]t appears that [the panel] is all white men' . . . ." *Id*. at 71 (alterations in original). On appeal, the CAAF found the appellant had made a "prima facie showing that gives rise to a presumption that race was allowed to enter the selection process." *Id*. at 74. In support of this conclusion, the CAAF cited "racial identifiers" that were included in court member questionnaires provided to the convening authority, as well as "other evidence before the [CCA]," and "the command's understandable belief that the *Crawford* case . . . was still good law." *Id*. Among this other evidence before the CCA was information that "two African American members on the original convening order were subsequently removed pursuant to the first amendment to the convening order; and three other courts-martial with African American accuseds were convened by this convening authority before all-white panel members." *Id*. In addition, the CCA obtained declarations from the convening authority and staff judge advocate, but "for all intents and purposes those affidavits simply reflected that they could not recall how the venire panel was chosen." *Id*. Under these circumstances, the CAAF found an "unrebutted inference that [a]ppellant's constitutional right to equal protection under the law was violated when the acting convening authority presumptively used a race-conscious selection process for panel members." *Id*.

### 3. Analysis

Because Appellant did not object to the convening authority's selection of court members at trial, we review for plain error. *See King*, 83 M.J. at 120–21. For the reasons stated below, we conclude Appellant has failed to demonstrate plain error.

Appellant claims that he has "made a prima facie showing that gives rise to a presumption that impermissible criteria was allowed to enter the court member selection process." Appellant claims that the documentation regarding the selection of court members fails to rebut this presumption because "none of it indicates the convening authorities did not consider the racial and gender identifiers available to them in the court member data sheets."

In support of this position, Appellant notes that in his case, as in *Jeter*, racial and gender identifiers for prospective court members were provided to the convening authorities. He also notes that, at the time of his trial, *Jeter* had not yet been decided, meaning that when selecting the panel of prospective members for Appellant's court-martial, the convening authority, in reliance on *United States v. Crawford*, 35 C.M.R. 3, 13 (C.M.A. 1964), "could use race to select a panel when it was 'in favor of, not against, an accused,'" which, in practice, as noted in *United States v. Loving*, 41 M.J. 213, 285 (C.A.A.F. 1994), meant that racial and gender identifiers could be included on the list of prospective members.

Relying on *Jeter*, Appellant contends his court-martial panel was improperly constituted because the convening authorities inappropriately considered gender in selecting members. According to Appellant, the "fact that the convening authority selected 100 percent of the potential panel members with traditionally female names, making them a larger proportion of the panel than . . . of the pool from which they were selected, suggests consideration of gender." Appellant does not identify additional facts to suggest the convening authority selected court members in his case based on race.

The Government relies on this court's opinion in *United States v. Patterson* to argue that the "routine provision" of members with traditionally female names to a convening authority "does not in itself constitute a prima facie showing the convening authority in fact improperly relied on such criteria in selecting members under the plain error standard of review." 2024 CCA LEXIS 399, at *20–21 (A.F. Ct. Crim. App. 27 Sep. 2024) (unpub. op.), *rev. granted on different grounds*, No. 25-0073/AF, __ M.J. __, 2025 CAAF LEXIS 16, *1 (C.A.A.F. 6 Jan. 2025)

Furthermore, the Government contends Appellant has not demonstrated error in the panel composed by the convening authority just because it included women. The Government's argument rests on the assertion that "[b]y simple math when there is a small minority of women offered as potential court-members, it is *more* likely that all of them will be selected while not *all* members of the majority with traditionally male names will be selected."

As an initial matter, although *Jeter* specifically addressed racial discrimination, we assume for purposes of our analysis the same rationale applies to the selection or exclusion of members based on gender. This question was addressed in *J.E.B. v. Ala. ex rel. T.B.*, where the Supreme Court held that "gender—like race—is an unconstitutional proxy for juror competence and impartiality." 511 U.S. 127, 128 (1994)*; see also Patterson*, unpub. op. at *20–21 (holding that "*J.E.B.* essentially put gender on the same constitutional footing as race").

We are not persuaded Appellant has met his burden to demonstrate "clear" or "obvious" error in the selection process. We agree with the Government that providing the convening authority some professional and personal information about potential court members, including race and gender, does not in itself constitute a prima facie showing that the convening authority improperly relied on race and gender in selecting members under the plain error standard of review. As our superior court stated in *Jeter*, "racial identifiers are neutral, [although] capable of being used for proper as well as improper reasons." 84 M.J. at 74 (citing *Loving*, 41 M.J. at 285).

The circumstances in *Jeter* are distinguishable in several significant ways. First, and importantly, the appellant in *Jeter* did not forfeit the issue but challenged the selection process at trial, alleging "systematic exclusion of members based on race and gender." 84 M.J. at 71. Moreover, the record in *Jeter* indicated the panel was composed entirely of "white men." *Id.* Two African American members on the original convening order were subsequently removed from the panel by the convening authority. *Id.* at 74. In the present case, when the convening authority relieved members in advance of trial, he relieved one of the members with a name suggesting they were female along with two other members whose names suggested they were male. The three replacement members all had traditionally male names. The two remaining female names were removed as a result of challenges by both parties. Second, in *Jeter* "three other courts-martial with African American accuseds were convened by [the same] convening authority before all-white panel members." *Id.* The CAAF concluded these circumstances in *Jeter*, coupled with the provision of racially identifying information to the convening authority, were sufficient for a prima facie showing under ordinary standards of review. In the instant case, we do not have equivalent circumstances.

Furthermore, we decline to expand and apply the holding in *Jeter* in such a way that could undermine the applicable federal statute. Essentially, Appellant is arguing that a convening authority cannot even know the name of any potential court member prior to making selections of the court members as such names could potentially reveal their genders. Practically, such a limitation upon convening authorities could prevent their ability to properly apply the criteria mandated for consideration by Article 25, UCMJ. For example, it would be quite a challenge for a convening authority to determine whether a potential court member, "in his opinion, [is] best qualified for the duty by reason of . . . judicial temperament" if they cannot know who they are evaluating. Article 25(e)(2), UCMJ.

Appellant has the burden to demonstrate "clear" or "obvious" error. He has not met this burden. Based on the facts of this case, we conclude Appellant is not entitled to relief on this issue.

**E. Timeliness of Appellate Review**

Although not raised by Appellant, we consider whether Appellant is entitled to relief for a facially unreasonable appellate delay. *See United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). We find no relief is warranted.

Appellant's record of trial was originally docketed with this court on 4 October 2023. However, it was docketed without a record of trial. As an Article 66(b)(1)(A), UCMJ, direct appeal, Appellant and this court waited for the

Government to produce a verbatim transcript, which was provided to this court on 23 April 2024. Appellant requested, and was granted, four enlargements of time before he filed his brief with this court on 19 November 2024. The Government filed its answer brief on 30 January 2025, after receiving an enlargement of time to obtain declarations from trial defense counsel. On 6 February 2025, Appellant filed a reply to the Government's answer.

"[C]onvicted servicemembers have a due process right to timely review and appeal of courts-martial convictions." *Moreno*, 63 M.J. at 135 (citations omitted). In *Moreno*, the CAAF established a presumption of facially unreasonable delay "where appellate review is not completed and a decision is not rendered within eighteen months of docketing the case before the [CCA]." *Id*. at 142. Where there is a facially unreasonable delay, we examine the four factors set forth in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice [to the appellant]." *Moreno*, 63 M.J. at 135 (citations omitted). The CAAF identified three types of cognizable prejudice for purposes of an appellant's due process right to timely post-trial review: (1) oppressive incarceration; (2) "particularized" anxiety and concern "that is distinguishable from the normal anxiety experienced by prisoners awaiting an appellate decision;" and (3) impairment of the appellant's grounds for appeal or ability to present a defense at a rehearing. *Id*. at 138–40 (citations omitted). Where there is no qualifying prejudice from the delay, there is no due process violation unless the delay is so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). We review de novo an appellant's entitlement to relief for post-trial delay. *United States v. Livak*, 80 M.J. 631, 633 (A.F. Ct. Crim. App. 2020) (citing *Moreno*, 63 M.J. at 135).

Over 18 months have elapsed since Appellant's record of trial was originally docketed with this court. Accordingly, under *Moreno* there is a facially unreasonable delay in the appellate proceedings. Although Appellant has not raised appellate delay in his assignments of error, we have evaluated the *Barker* factors. Appellant has not specifically alleged cognizable prejudice, and we find none. In particular, we have found no material prejudice to Appellant's substantial rights and affirm his sentence; therefore, we find his confinement has not been "oppressive" for purposes of our *Moreno* analysis. Furthermore, we find the delays involved in Appellant's case have not been so egregious as to adversely affect the perception of the military justice system.

The initial delay arose from the requirement to produce a verbatim transcript for a case eligible for an Article 66(b)(1)(A), UCMJ, direct appeal. The subsequent delays arose from Appellant's motions for enlargements of time. The delays before the Government's answer are attributable to the extent and

complexity of Appellant's five assignments of error, including his claims of ineffective assistance of counsel. From the time the record was docketed, appellate review has proceeded without unreasonable delay. We note this court has issued its opinion less than four weeks over the 18-month *Moreno* standard. We note the transcript and record of trial are lengthy. Additionally, we note Appellant has not made a demand for speedy appellate review. Accordingly, we find no violation of Appellant's due process rights.

We also conclude there is no basis for relief under Article 66(d)(2), UCMJ, in the absence of a due process violation. Considering all the facts and circumstances of Appellant's case, we decline to exercise our Article 66(d), UCMJ, 10 U.S.C. § 866(d), authority to grant relief for the delay in completing appellate review.

## II. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to Appellant's substantial rights occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court